# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

| | | |
|---|---|---|
| **SOFTWARE RIGHTS ARCHIVE, LLC,** | § | |
| | § | |
| **Plaintiff,** | § | |
| | § | **Civil Action No. 2:07-cv-511-TJW** |
| **v.** | § | |
| | § | |
| **GOOGLE INC., YAHOO! INC.,** | § | |
| **IAC SEARCH & MEDIA, INC., AOL LLC,** | § | **JURY TRIAL DEMANDED** |
| **and LYCOS, INC.,** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

I.   SUMMARY OF ARGUMENT ................................................................. 1

II.  STATEMENT OF FACTS .................................................................... 2

     A.   In July 1997, Site/Tech, the undisputed owner of the patents-in-suit
          at the time, transferred the patents to Site Tech. ................................. 3

     B.   After July 1997, Site Tech and Site/Tech merged corporate personalities. ............ 5

     C.   In September 1998, Site Tech sold and assigned the patents-in-suit to Egger, and
          Site/Tech was bound by the assignment. ................................................ 6

     D.   In December 2000, Site/Tech formally was merged into Site Tech and transferred
          all its remaining assets to Site Tech. ................................................ 6

III. ARGUMENT AND AUTHORITIES .............................................................. 7

     A.   Egger acquired the patents in September 1998. ......................................... 7

          1.   Site Tech owned the patents in September 1998, having
               acquired them from Site/Tech in July 1997. ..................................... 7

               a.   Site Tech acquired the patents by operation of law. ..................... 7

               b.   Site Tech acquired the patents by written
                    conveyance. ............................................................ 11

               c.   Site Tech acquired the patents by ratification. ........................ 12

          2.   Even assuming Site Tech did not own the patents in
               September 1998, the subsidiary Site/Tech also was bound
               by the assignment to Egger. ................................................... 13

               a.   Site/Tech was bound because it was the alter ego of
                    Site Tech. ............................................................ 13

b.    Site/Tech was bound to the assignment, because it had authorized Site Tech to assign the patents to Egger in Site Tech's name. ............................................................ 15

    (i)    Site Tech had the actual authority from Site/Tech to transfer the patents in its own name. ............................................................ 17

    (ii)    Site Tech also had the ostensible or apparent authority to transfer the patents-in-suit. ........................... 18

    (iii)    Site/Tech has ratified the 1998 and 2005 Assignments. ............................................................ 21

B.    The undisputed facts demonstrate that, at the latest, Egger acquired the patents in December 2000. ............................................................ 21

C.    Defendants misrepresent the February 2005 Assignment from Site/Tech to Egger. ............................................................ 24

D.    Defendants' assertion that the Site Tech bankruptcy extinguished Egger's rights to the patents-in-suit is wrong. ............................................................ 25

    1.    If Site/Tech held the patents, then bankruptcy did not defeat Egger's rights. ............................................................ 25

    2.    If Site Tech held the patents, then bankruptcy did not defeat Egger's rights. ............................................................ 25

IV.    CONCLUSION ............................................................ 28

CERTIFICATE OF SERVICE ............................................................ 30

## PLAINTIFF'S RESPONSE TO DEFENDANTS' MOTION TO DISMISS

Plaintiff Software Rights Archive, LLC ("Plaintiff" or "SRA") files this Response to Defendants' Motion to Dismiss, and shows the Court as follows:

## I. SUMMARY OF ARGUMENT

For nearly 10 years, no one questioned that the patents-in-suit were the property of Daniel Egger (and, hence, the plaintiff, SRA). Now, in an effort to evade the jurisdiction of this Court, the Defendants seek to bootstrap an incomplete reading of corporate documents to undo an assignment that all parties intended, consummated, described publicly and have subsequently ratified. Defendants' motion to dismiss consciously disregards the contemporaneous documents demonstrating that Egger acquired the patents long before he assigned them to SRA. Defendants' motion to dismiss should be denied.

Defendants' central contention—that Egger did not acquire the patents-in-suit before February 2005—is not only wrong, it is contradicted by numerous company documents, sworn SEC filings, emails, sworn declarations, and common sense. For multiple independent reasons, Egger acquired the patents before February 2005:

- In July 1997, Site/Technologies/Inc. ("Site/Tech")[1], the undisputed owner of the patents at the time, transferred the patents to its parent company Site Technologies, Inc. ("Site Tech").[2] In September 1998, Site Tech assigned the patents to Daniel Egger through a bill of sale and assignment. Egger thus acquired the patents in September 1998.

- Defendants claim that the true owner of the patents in September 1998 was Site/Tech, not Site Tech. Defendants are wrong, but even if Defendants were correct, Egger still would have acquired the patents in September 1998 because Site/Tech was bound by the September 1998 assignment to Egger. The assignment was executed by the CEO

---

[1] Site/Technologies/Inc., the subsidiary, was known as "Libertech, Inc." prior to August 1996, when it was subsequently acquired by DeltaPoint, Inc. For the sake of consistency, this brief refers to Libertech, Inc. and Site/Technologies/Inc. as "Site/Tech."

[2] Site Technologies, Inc., the parent, originally was known as "DeltaPoint, Inc." It changed its name from "DeltaPoint, Inc." to "Site Technologies, Inc." in October 1997—three months after it acquired Site/Technologies/Inc. For the sake of consistency, this brief refers to DeltaPoint, Inc. and Site Technologies, Inc. as "Site Tech."

of Site/Tech; Site/Tech was the alter ego of Site Tech; and Site/Tech had authorized Site Tech to assign the patents to Egger in Site Tech's name.

- Finally, even assuming that title was not transferred in September 1998, Egger undoubtedly acquired the patents at the latest in December 2000. By that time—Defendants themselves admit—Site Tech would have acquired the patents from its subsidiary Site/Tech even if it had not done so previously. Thus, by late 2000, Egger would have acquired the patents from Site Tech by operation of the after-acquired title doctrine.

Because Egger acquired the patents before February 2005, his transfer to SRA was effective.

As a final note, Defendants falsely accuse Egger of fraud and misconduct. Defendants' effort is irrelevant to their motion, and unavailing in any event. It is irrelevant because the February 2005 assignment from Site/Tech to Egger has nothing to do with the chain of title in this case. It is unavailing because that assignment, which merely functioned as replacement for a lost assignment, has been fully ratified by Site/Tech. In short, Defendants' attempts to smear Egger should be disregarded.

## II. STATEMENT OF FACTS

Egger invented search engines employing link analysis, and SRA owns the patents-in-suit. The early history of the patents-in-suit is undisputed. In June 1993, Egger applied for what would become the '352 Patent. *Ex. 1.* In November 1993, Egger assigned the June 1993 patent application to Libertech, Inc. ("Libertech"). *Ex. 2.* In May 1996, Egger and two colleagues applied for what would become the '494 and '571 Patents. *Ex. 3.* In June 1996, Egger and his colleagues assigned the May 1996 patent application to Libertech. *Ex. 4.* In August 1996, Libertech changed its name to Site/Technologies/Inc. ("Site/Tech"). *Ex. 5.* Site/Tech was acquired by DeltaPoint, Inc. ("DeltaPoint"), which later changed its name to Site Technologies, Inc. and will be referred to herein as "Site Tech."

**A.  In July 1997, Site/Tech, the undisputed owner of the patents-in-suit at the time, transferred the patents to Site Tech.**

In July 1997, Site Tech acquired Site/Tech in what was intended to be a *de facto* merger transaction that placed all the stock and, separately, all of the assets of Site/Tech (including the patents-in-suit) in Site Tech.  For tax reasons, the parties structured the acquisition as a stock exchange with a distribution of assets into the parent, rather than as a formal merger.  *See Ex. 6* ("The transaction must be structured as a stock exchange, rather than a merger, to make it taxable.").  The parties, though, also intended to merge the operations and assets of Site/Tech into Site Tech, as confirmed by Site Tech's CEO and documents executed in connection with the transaction.  *See, e.g., Ex. 7*, ¶ 2 ("The purpose of this transaction was to merge the business of Site/Tech into DeltaPoint, Inc."); *Ex. 8* ("DeltaPoint intends to continue the business of Site after the date hereof and integrate such business into DeltaPoint's ongoing business.").

Because the parties intended to merge the operations of Site/Tech into Site Tech without a formal merger, just three days before the acquisition, Site/Tech amended its certificate of incorporation to make the anticipated stock exchange trigger the liquidation preferences and distribution provisions of Site/Tech.  *See Ex. 10* ("In the event of ... a sale of all or substantially all of ... the stock of the corporation, ... such event shall be treated as a liquidation ...."); *Ex. 9* (Site/Tech special board minutes, referencing liquidation)*; Ex. 6* ("This will require an amendment to the company's articles to make it absolutely clear that an exchange is a liquidation.").  These provisions mandated "distributions to the shareholders of the corporation." *Ex. 10*.  Specifically, following payment of a sum of money to the preferred stockholders, "the entire remaining assets and funds of the corporation legally available for distribution, if any, shall be distributed ratably among the [preferred stock]holders .... Thereafter, any remaining assets and funds legally available for distribution hereunder shall be distributed solely to the

holders of the Common Stock." *Ex. 10.* The stock exchange agreement prescribed that Site Tech (then still known as DeltaPoint) would become the sole stockholder of Site/Tech following the stock exchange. *See Ex. 11.* Thus, Site/Tech's amended certificate of incorporation operated to distribute its patents and other assets to its sole shareholder Site Tech upon consummation of the stock exchange and subsequent stock distribution. *See Ex. 7,* ¶ 2 ("In this transaction, DeltaPoint directly acquired all outstanding stock of Site/Tech and all of the then-existing assets of the company, including its patents and trademarks.").

After the acquisition, Site Tech repeatedly confirmed that it had acquired the patents from Site/Tech. In five separate SEC filings, Site Tech reported: "On July 11, 1997, the Company acquired the shares of Site/technologies/inc. ("Site") for an aggregate purchase price of $638,000.... In exchange the Company's received *all outstanding assets* of Site." *See Exs. 12-16* (emphasis supplied). Further, in each of three separate SEC filings, Site Tech repeated six times that it had acquired specific technologies through its acquisition of Site/Tech. *See Exs. 13-15; see also Ex. 16* (making four such statements). For example: "In July 1997, the Company acquired Site/technologies/inc. ... pursuant to which the Company acquired, among other things, SiteSweeper 1.0, a Web site quality control and maintenance product." *Exs. 13-16.* Likewise, Site Tech updated its balance sheet to reflect its acquisition of Site/Tech's assets: "The pro forma condensed balance sheet reflects the effects of the acquisition of Site based upon the fair market value of *the acquired assets* and liabilities on July 11, 1997...." *Exs. 12-16* (emphasis supplied). Most pointedly, in a 1998 SEC filing, Site Tech reported that it had acquired the patents-in-suit as part of the Site/Tech acquisition: "[The] V-Search technology and related patents ... was technology that the Company acquired in the Site Tech Acquisition." *Ex. 17.*

**B.    After July 1997, Site Tech and Site/Tech merged corporate personalities.**

Following the July 1997 acquisition, Site Tech and Site/Tech merged corporate personalities.    For starters, Site Tech changed its name from "DeltaPoint, Inc." to "Site Technologies, Inc.," effectively adopting the persona of the *de facto* merged subsidiary. *Ex. 7, ¶ 2; Ex. 18; Ex. 23.*    Site Tech also adopted Site/Tech's trademarks, email addresses, web address, and developed and sold Site/Tech's former products as its own. *Ex. 7, ¶ 2.*    The companies also merged principal offices; Site/Tech moved its principal office from North Carolina to Site Tech's principal office in California. *Ex. 19.*

Site/Tech's operations also merged into Site Tech.  *Ex. 7, ¶ 2.*  Site/Tech no longer maintained adequate capitalization, having no significant assets or equity. *See Ex. 20.*  Site/Tech took no money in loans, and its stock structure consisted of fewer than 1,000 shares—all owned by Site Tech. *Ex. 21; Ex. 22; Ex. 7, ¶ 2.*  Site/Tech had no separate employees. *Ex. 11; Ex. 7, ¶ 2.*  Instead, all of Site/Tech's employees prior to the stock exchange either left the company or became Site Tech employees following the stock exchange.  *Ex. 11; Ex. 7, ¶ 2.*  Site Tech conducted Site/Tech's few remaining business affairs on Site/Tech's behalf.  For example, Site Tech prepared and maintained Site/Tech's tax records.  *Ex. 7, ¶ 2.*  Site/Tech also did not segregate its corporate records from those of Site Tech. *Ex. 7, ¶ 3.*  In fact, Site/Tech maintained no corporate records at all. *Ex. 7, ¶ 3.*  Further, Site/Tech disregarded corporate formalities.  For example, it held no director meetings or shareholder meetings. *Ex. 7, ¶ 3.*  It made no decisions, and took no actions, separate from Site Tech. *Ex. 7, ¶ 3.*  Site/Tech also engaged in no business activity of its own. *Ex. 7, ¶¶ 2, 3.*  It designed nothing, produced nothing, marketed nothing, and sold nothing. *Ex. 7, ¶ 2.*  It had no significant costs or revenues. *Ex. 7, ¶ 2; Ex. 20.*  Indeed, Site/Tech maintained no bank account separate from Site Tech's bank account.  *Ex. 7, ¶ 3.*  Site/Tech did not segregate any assets from Site Tech's assets. *Ex. 7, ¶ 3.*

Finally, Site Tech exercised complete control over Site/Tech. Site Tech owned 100% of Site/Tech's stock. *Ex. 11*. Site Tech's directors and officers were Site/Tech's directors and officers. *Ex. 11*, ¶ 5.7; *Ex. 28*. In short, Site Tech made all of Site/Tech's decisions and took all of Site/Tech's actions. Site/Tech and Site Tech merged corporate personalities.

**C.  In September 1998, Site Tech sold and assigned the patents-in-suit to Egger, and Site/Tech was bound by the assignment.**

In September 1998, Site Tech and Egger entered into a Bill of Sale, Assignment and License Agreement ("the assignment"), to which Site/Tech also was bound, that sold and assigned the patents-in-suit to Egger. *Ex. 24*. Site Tech represented to Egger that Site Tech had specifically warranted in 1998 that it was transferring "good and marketable title," that it was the "sole owners," and that it had "full right to convey the entire interest" in the patents. *Ex. 24*. Egger executed the assignment on his own behalf. *Ex. 24*. Jeffrey Ait, the CEO of Site/Tech and Site Tech, executed the assignment on behalf of both companies. *Ex. 7*, ¶ 6. Indeed, Site/Tech had authorized Ait to assign the patents to Egger in Site Tech's name. *Ex. 7*, ¶ 6. The intent of all parties was to transfer the patents-in-suit to Daniel Egger, who paid $100,000 for the patents-in-suit. *Ex. 7*, ¶¶ 5-6. Ait later delivered the technology and physical property to Egger. *Ex. 17*; *Ex. 7*, ¶ 6. Neither Site/Tech nor Site Tech thereafter represented that it owned the patents-in-suit. *Ex. 7*, ¶ 6.

**D.  In December 2000, Site/Tech formally was merged into Site Tech and transferred all its remaining assets to Site Tech.**

In December 2000, Site/Tech formally was merged into Site Tech. *Exs. 29-31*. Site/Tech thereby transferred whatever assets it possessed at that point to Site Tech. Therefore, if Site/Tech still possessed the patents-in-suit in December 2000, Site Tech undoubtedly owned them from that point forward. Defendants agree. *See* Defendants' Motion at 5, 11.

## III.    ARGUMENT AND AUTHORITIES

### A.    Egger acquired the patents in September 1998.

Egger acquired the patents in September 1998 in accordance with a Bill of Sale, Assignment and License Agreement. *Ex. 24.*

> 1.    Site Tech owned the patents in September 1998, having acquired them from Site/Tech in July 1997.

Site Tech acquired the patents from Site/Tech in connection with Site Tech's July 1997 acquisition of Site/Tech. Defendants incorrectly assert that the July 1997 acquisition involved only a stock transfer. *See* Defendants' Motion, at 9, n.9. To the contrary, Site/Tech also transferred its assets, including the patents. *See, e.g., Ex. 7,* ¶ 2.

> a.    Site Tech acquired the patents by operation of law.

Federal Circuit law recognizes that patents can be conveyed by operation of law:

> We conclude that the district court's focus solely on section 261 was erroneous. Section 154 of Title 35 states that "[e]very patent shall contain a short title of the invention and a grant to the patentee, his heirs or assigns, of the right to exclude others from making, using, offering for sale, or selling the invention throughout the United States...." 35 U.S.C. § 154(a)(1) (emphasis added). As both parties note, patent ownership may be transferred by assignment, and section 261 addresses such a transfer – requiring assignments to be in writing. See 35 U.S.C. § 261. However, there is nothing that limits assignment as the only means for transferring patent ownership. Indeed, the case law illustrates that ownership of a patent may be changed by operation of law.

*Akazawa v. Link New Tech. Int'l, Inc.*, 520 F.3d 1354, 1356 (Fed. Cir. 2008) (emphasis omitted).

In this case, Site/Tech transferred its patents to Site Tech by operation of law through its certificate of incorporation. Three days before the stock exchange between the two companies, Site/Tech's board amended Site/Tech's certificate of incorporation to make the sale of Site/Tech's stock to Site Tech a triggering event for purposes of distribution in accordance with the company's distribution preferences: "In the event of ... a sale of all or substantially all of ... the stock of the corporation, ... such event shall be treated as a liquidation, dissolution or winding

up within the meaning of this Section." *See Ex. 10.* The phrase "the stock of the corporation" previously was not present in Site/Tech's restated certificate of incorporation, and had to be added to make the upcoming stock acquisition by Site Tech a deemed "liquidation event" within the meaning of the certificate of incorporation.[3] *See Ex. 10.*

Site Tech's acquisition of Site/Tech's stock triggered a liquidation event under Site/Tech's amended certificate of incorporation, which in turn resulted in the distribution of Site/Tech's assets, including the patents-in-suit, to Site Tech.[4] Several of Site Tech's contemporaneous SEC filings—all of which Defendants incorrectly and cavalierly dismiss as "inaccurate"—confirm that "[i]n exchange [Site Tech] received all outstanding assets of [Site/Tech]." *See, e.g., Ex. 12.*

The deemed liquidation event mandated a distribution of assets in accordance with the liquidation preferences of the certificate of incorporation, which provided:

> In the event of any liquidation, dissolution, or winding up of the corporation (or the deemed occurrence of such event pursuant to subsection (d) below), either voluntary or involuntary, *distributions to the shareholders* of the corporation *shall be made* in the following manner:

*Ex. 10* (emphasis supplied). The Stock Exchange Agreement further provided that preferred stock and treasury stock of Site/Tech was cancelled, leaving the common stock transferred to Site Tech as the only stock left in the company. *See Ex. 11.* Since only common stock of Site/Tech remained, § IV.(B)2b of the Amended Certificate was invoked, resulting in a distribution of the assets to DeltaPoint, the sole common stockholder:

> (b) <u>Distribution after Payment of Liquidation Preferences</u>. Thereafter, *any remaining assets* and funds legally available for distribution hereunder *shall be*

---

[3] The amendment to the certificate of incorporation ("Amended Certificate") was included as an exhibit to the purchase agreement. The Amended Certificate, with this new triggering mechanism, became effective on July 11, 1997—the same day Site Tech acquired Site/Tech's stock. *Ex. 10.*

[4] On July 3, 1997, Site/Tech's Steve Mendel wrote: "The transaction must be structured as a stock exchange, rather than a merger, to make it taxable. This will require an amendment to the company's articles to make it absolutely clear that an exchange is a liquidation." *Ex. 6.*

*distributed* solely to the holders of the Common Stock in a manner such that the remaining amount distributed to each holder of Common Stock ...

*Ex. 10* (emphasis supplied). Thus, immediately after the stock exchange, Site/Tech distributed its assets, including the patents-in-suit, to Site Tech.

A similar and recent case from this District applied the holding of *Akazawa* and found that legal title to patents transferred by operation of state law in a foreclosure proceeding. *See Sky Techs. LLC v. SAP AG*, 2008 WL 2775487, *1 (E.D. Tex. July 15, 2008). In denying the defendants' motion to dismiss for lack of standing, Judge Folsom held that "ownership of a patent may be changed by operation of law." *See Ex. 25, Sky Technologies LLC v. SAP AG*, Civil Action No. 2:06-CV-440 (DF), Order dated June 4, 2008, at 10. Judge Folsom further noted that the Federal Circuit's recent holding in *Akazawa* rejects the argument that a writing is required to fully transfer legal title when an operation of law conveys title. *See id.* at 18. Accordingly, the *Sky Technologies* court determined and found that a security agreement and subsequent foreclosure transferred the patent by operation of law. *See id.*

In this case, the controlling Delaware law specifically provides that assets may be transferred upon a distribution of the type provided in the Amended Certificate. Section 173 of Delaware's General Corporate Law allows for the payment of dividends in kind. The statute allows dividends to be paid "in cash, in property, or in shares of corporation's capital stock." 8 Del. C. 1953, § 173. In this case, the patents transferred by operation of law.

The distribution of Site/Tech's assets to Site Tech as part of the July 1997 transaction has been confirmed numerous times in sworn, written certifications by Site/Tech's officers and by

Site Tech (at that time still named "DeltaPoint") in SEC filings, press releases, and in a declaration attached to this Response:[5]

- "On July 11, 1997, the Company acquired the shares of Site/technologies/inc. ("Site") for an aggregate purchase price of $638,000.... *In exchange the Company's received all outstanding assets of Site.* The Company will record the expense related to purchased in-process technology of approximately $500,000 during the third quarter of 1997." *Ex. 12* (emphasis supplied).

- "On July 11, 1997, the Company acquired the shares of Site/technologies/inc. ("Site") for an aggregate purchase price of $638,000.... In exchange the Company acquired all the outstanding shares *and assets* of Site." *Ex. 16* (emphasis supplied).

- "In exchange the Company acquired all the outstanding shares *and assets* of Site." *Ex. 13* (emphasis supplied).

- "In exchange the Company acquired all the outstanding shares *and assets* of Site." *Ex. 14* (emphasis supplied).

- "In exchange the Company acquired all the outstanding shares *and assets* of Site." *Ex. 15* (emphasis supplied).

- The SEC filings further call out specific assets that were acquired during the acquisition: "Increase in Accounts Receivable is equal to Site's accounts receivable of $8,000 at 7/11/97 *which Deltapoint acquired.*"; "Increase in Property and Equipment is equal to Site's property and equipment of $67,000 at 7/11/97 *which Deltapoint acquired.*" *Ex. 12* (emphasis supplied).

- "On September 30, 1998, [Site Tech] consummated the sale of its V-Search technology and related patents [i.e. the Patents]. *This was technology that the Company acquired in the [Site/Tech] Acquisition.* The Company sold the assets relating to V-Search in cash to Daniel Edgar [*sic*]. The Company received a cash payment of $100,000." *Ex. 17* (emphasis supplied).

Each of these SEC filings was certified by Jeffrey Ait, the Chief Executive Officer of both the parent Site Tech and the subsidiary Site/Tech.[6] *Ex. 7*, ¶ 6. These post-conveyance affirmations are strong evidence of the transfer. *See COR Mktg. & Sales, Inc. v. Greyhawk Corp.*, 994 F.

---

[5] For example: "In July 1997, the Company acquired Site/technologies/inc. . . . pursuant to which the Company acquired, among other things, SiteSweeper 1.0, a Web site quality control and maintenance product." *Exs. 13-16.* The assets were added to the balance sheet of Site Tech: "The pro forma condensed balance sheet reflects the effects of the acquisition . . . based upon the fair market value of the acquired assets and liabilities on July 11, 1997, as if such acquisition had been consummated on June 30, 1997." *Exs. 12-16.*

[6] The patents-in-suit were specifically listed as an asset in the schedules to the Stock Exchange Agreement. *Ex. 33.* Furthermore, Site Tech's 1998 sale of the V-Search technology and patents to Daniel Egger is also described in Site Tech's 10-QSB filed on September 30, 1998. *Ex. 17.*

Supp. 437, 444 (W.D.N.Y. 1998) (considering post-transaction statements as evidence of an assignment).

Site Tech also warranted that it had legal title to the patents-in-suit in two further documents: the 1998 Bill of Sale to Daniel Egger and the 1998 Assignment to Daniel Egger. *See Ex. 24.* Both warranties further corroborate the SEC filings that the assets, including the patents-in-suit, were transferred from the subsidiary to the parent in connection with the 1997 acquisition.[7]

b.  <u>Site Tech acquired the patents by written conveyance.</u>

Further, even if Section 261's writing requirement did apply, it was satisfied because the distribution clause in the certificate of incorporation constitutes a written conveyance instrument. The Federal Circuit has specifically stated that written transfers of patents through stock ownership and other successorship transactions satisfy Section 261:

> 35 U.S.C. § 261 provides that "applications for patent, patents, or any interest therein" are assignable "by an instrument in writing." The patent statutes allow the instrument that assigns "any interest" to take the form of a patent license or any other written instrument that transfers patent rights. The type of written instrument (e.g., license or assignment agreement, *dissolution agreement*, or *merger agreement*) and the factual context in which the instrument is created is irrelevant—this does not provide a basis for divorcing the standing analysis from the patent statutes.

*Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1338 n.3 (Fed. Cir. 2007) (emphasis supplied).

Here, the written instrument stated as follows:

> In the event of any liquidation, dissolution, or winding up of the corporation (or the deemed occurrence of such event pursuant to subsection (d) below), either voluntary or involuntary, *distributions to the shareholders* of the corporation *shall be made* in the following manner ... *any remaining assets* [after satisfying

---

[7] The 1998 Bill of Sale to Egger warranted, "Seller [Site Tech] warrants that it hereby transfers good and marketable title to the Purchased Assets, free and clear of all liabilities, mortgages, liens, pledges, charges, security interests, encumbrances, or title retention agreements of any kind or nature." *Ex. 24.* The 1998 Assignment warranted: "[Assignor] is the sole owner of Patent number 5,544,352," and "THE UNDERSIGNED HEREBY covenants and agrees that it has full right to convey the entire interest herein assigned, and that it has not executed, and will not execute, any agreement in conflict herewith." *Ex. 24.*

liquidated preferences] and funds legally available for distribution hereunder *shall be distributed* solely to the holders of the Common Stock...

*Ex. 10.*[8]

The patents-in-suit were transferred in 1997 from Site/Tech to Site Tech by an operation of law endorsed by *Akazawa* and through the writing requirement satisfied by the distribution clause of the certificate of incorporation as evidenced by the subsequent SEC filing.

c.     Site Tech acquired the patents by ratification.

Alternatively, Site/Tech transferred the patents to Site Tech in connection with the July 1997 acquisition by virtue of the ratification doctrine. Under this doctrine, where a board of directors has notice of a transfer, does not object to the transfer, and retains the fruits of the transfer, it is held as a matter of law to have approved the transfer by ratification. *See Hannigan v. Italo Petrol. Corp. of Am.*, 47 A.2d 169, 171-72 (Del. 1945). Here, all the parties to the July 1997 acquisition, including Site/Tech's board, intended that Site/Tech would distribute all its assets as a dividend to the common stockholder, which was Site Tech, as part of the acquisition. Indeed, the Site/Tech board of directors amended its certificate of incorporation to achieve this very purpose. Further, it is undisputed that Site/Tech did not object to the transfer—which is hardly surprising, as the board members were the same for both companies—when Site Tech repeatedly represented in public filings that it had acquired the patents from Site/Tech. *Ex. 11*, ¶ 5.7. Finally, it is undisputed that the Site/Tech board retained the fruits of the acquisition. Thus, the Site/Tech board ratified the July 1997 transfer of the patents from Site/Tech to Site Tech. *See, e.g., CarrAmerica Realty Corp. v. Kaidanow*, 321 F.3d 165, 173 (D.C. Cir. 2003)

---

[8] General conveyances of "all assets" of a company are operative to convey patents. *See, e.g., CMS Indus., Inc. v. L.P.S. Int'l, Ltd.*, 643 F.2d 289, 292 (5th Cir. 1981) ("In February 1973, all assets of Stoplifter were transferred to Stop-Loss, Inc. (Stop-Loss) another majority-held subsidiary of SEE. It is undisputed that whatever rights in the patents existed in Stoplifter were validly transferred to Stop-Loss."); *Intel Corp. v. Broadcom*, 173 F. Supp. 2d 201, 209 (D. Del. 2001); *Surfer Internet Broadcasting of Mississippi v. XM Satellite Radio, Inc.*, 2008 WL 1868426, *1 (N.D. Miss. 2008); *Mechmetals Corp. v. Telex Comp. Prods., Inc.*, 709 F.2d 1287, 1290 (9th Cir. 1983).

(applying Delaware law, the Court held "that the Board took necessary steps to ratify the issuance of the shares at the December 1998 Board meeting, at least through implied ratification.").

2.     <u>Even assuming Site Tech did not own the patents in September 1998, the subsidiary Site/Tech also was bound by the assignment to Egger.</u>

Even if Defendants were correct that Site/Tech, not Site Tech, was the owner of the patents in September 1998, it makes no difference because Site/Tech was bound to Site Tech's September 1998 sale and assignment to Egger.

a.     <u>Site/Tech was bound because it was the alter ego of Site Tech.</u>

Site/Tech was bound to the 1998 Bill of Sale and Assignment because Site/Tech and Site Tech were in substance the same entity. Alter ego is determined under the law of the state of incorporation. *See Davaco, Inc. v. AZ3, Inc.*, 2008 WL 2243382, *1 (N.D. Tex. May 30, 2008). In this case, Delaware law provides that separate corporate entities will be disregarded "in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it...." *Pauley Petrol. Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968). Delaware applies the same factors to determine alter ego that have been applied in the Fifth Circuit and other jurisdictions. *Compare Alberto v. Diversified Group, Inc.*, 55 F.3d 201, 205-06 (5th Cir. 1995) (applying Delaware alter ego factors) *and TIP Sys., LLC v. SBC Operations, Inc.*, 536 F. Supp. 2d 745, 754-55 (S.D. Tex. 2008) (alter ego factors applied in patent case).

Here, Site/Tech and Site Tech had an alter ego relationship after the July 1997 *de facto* merger; the following factors overwhelmingly demonstrate the alter ego relationship:

- Site/Tech was wholly-owned by Site Tech. *Ex. 11.*

- Site Tech and Site/Tech had *identical* directors and officers. *Id.*

- Site Tech and Site/Tech had the same business department. *Ex. 7, ¶ 2.* Site/Tech had no employees or operations of its own; instead, all of Site/Tech's operations were conducted through Site Tech. *Id.*

- Site Tech and Site/Tech filed consolidated financial statements and Site Tech filed Site/Tech's tax returns on its behalf. *Id.*

- Site Tech financed Site/Tech. *Id.* In fact, Site/Tech had negligible assets from which to operate. *See Ex. 20; Ex. 7, ¶ 2.*

- Site Tech did not cause Site/Tech's incorporation. However, Site/Tech wholly owned Site Tech and turned it into a shell entity after acquiring it. *Ex. 11.*

- Site/Tech had essentially no assets, it had no equity, it took no money in loans, and its stock structure consisted of fewer than 1,000 shares—all owned by Site Tech. *Ex. 7, ¶ 2; Exs. 20-22.*

- Site Tech directly employed all of Site/Tech's former employees and paid virtually all its expenses. *Ex. 7, ¶ 2.*

- Site/Tech did not receive any independent business; its sole source of revenue in fact was royalties paid it by Site Tech. Site/Tech had no further business—it designed nothing, produced nothing, marketed nothing, and sold nothing. *Id.* It had no significant costs or revenues. *Id.*

- Site Tech used, and represented that it owned, all of Site/Tech's assets. *Id.*

- Site/Tech had no independent daily operations; all its daily operations were assumed by Site Tech following the stock exchange. *Id.*

- Site/Tech failed to observe such formalities; it neither kept separate books and records nor held shareholder meetings nor held board meetings. *Id. ¶ 3.*

- Site/Tech's directors and officers took orders from Site Tech and acted in Site Tech's interest; the companies had the same directors and officers. *Ex. 11.*

- The person who signed the bill of sale and assignment was Jeffrey Ait, a director and the CEO of both Site Tech and Site/Tech. *Ex. 7, ¶ 1.*

- Site Tech changed its name from "DeltaPoint" to "Site Technologies, Inc." to adopt the persona of "Site/Technologies/Inc." *Ex. 7, ¶ 2; Ex. 18; Ex. 23.* Site Tech and Site/Tech employed the same website and email addresses. *Ex. 7, ¶ 2.*

- Site Tech and Site/Tech had the same bank account. *Ex. 7, ¶ 3.*

- Site Tech represented that it was liable for the debts of Site/Tech and assumed Site/Tech's liabilities in connection with the stock exchange. *Exs. 12-16.*

- Site/Tech moved its principal office from North Carolina to Site Tech's office in California. *Ex. 19.*

In short, the two entities were "one and the same." *Cf. Equitable Trust Co. v. Gallagher,* 99 A.2d 490, 493 (Del. 1953). Therefore, the patents-in-suit were transferred to Egger by the 1998 bill of sale and assignment, or any of the subsequent acts confirming the transfer of the patents-in-suit to Egger.

Further, if this Court were to disregard the evidence demonstrating that the parent Site Tech owned the patents when it sold them to Egger, finding an alter ego relationship would be necessary to prevent an injustice to Egger. Site Tech represented and warranted to Egger that it had and was transferring title to the patents. *Ex. 24.* The assignment benefited all three parties. For Site Tech and Site/Tech, it provided $100,000 in needed funds. *Ex. 17.* For Egger, it returned to him the rights to his inventions, into which he had invested his personal funds and years of his life. The assignment also harmed no one's interests. In other words, it created net social value. All three entities also intended the assignment—and still intend it today. *See Ex. 7,* ¶ 6. From 1998 to today, nobody has ever disputed the assignment, except for Defendants.

The alter ego doctrine and the interests of justice dictate that Site/Tech was bound by the Bill of Sale and Assignment and subsequent confirmations.

       b.    <u>Site/Tech was bound to the assignment, because it had authorized Site Tech to assign the patents to Egger in Site Tech's name.</u>

Agency principles also dictate that Site/Tech was bound by the 1998 Bill of Sale and Assignment. Specifically, Site/Tech had authorized Site Tech to assign the patents to Egger in Site Tech's name.

Patent assignments are subject to rules of construction that apply to contracts generally, and the manifest intention of the parties is of primary concern in construing the assignment. *See Nicolson Pavement Co. v. Jenkins,* 81 U.S. 452, 456 (1871) ("An assignment of an interest in an

invention secured by letters-patent, is a contract, and like all other contracts is to be construed so as to carry out the intention of the parties to it."); *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 874 (Fed. Cir. 1991).

Jeffrey Ait, as the CEO of Site/Tech and as a director of Site/Tech, was an authorized agent for Site/Tech. *See Ex. 7,* ¶ 6. Furthermore, Ait was explicitly authorized by both the parent Site Tech and the subsidiary Site/Tech to sell the patents-in-suit to Daniel Egger in either party's name. *See Id.* Ait regularly exercised control over the former property of the subsidiary Site/Tech, and engaged in more than one transaction in the name of Site Tech disposing of assets that were obtained during the acquisition of Site/Tech. *See Id.* As an agent of the subsidiary Site/Tech, Ait's knowledge and his acts concerning this transaction are imputed to Site/Tech.

Because Ait's knowledge and acts are imputed to Site/Tech, Site/Tech made repeated representations to Daniel Egger and to the public at large that the parent company Site Tech owned the patents, and therefore had the authority to sell the patents:

- In multiple SEC filings and accounting statements, Ait represented that Site Tech, acquired all assets, including the patents, of Site/Tech and described assets allegedly belonging to Site/Tech as assets of Site Tech. *Ex. 12-16.*

- Ait executed a warranty of title in the Bill of Sale indicating that the parent corporation Site Tech owned the patents and was transferring valid title to Daniel Egger. *Ex. 24.*

The actions of the agents of both Site Tech and Site/Tech also give rise to an agency relationship between Site/Tech and Site Tech with respect to the sale of the patents-in-suit to Egger. As such, Site/Tech would be bound to the 1998 Assignments as a party under the doctrines of actual authority, apparent authority, and ratification.

An agency relationship need not be an explicit agreement, but also is found when there are facts and circumstances giving rise to a relationship that should affect the legal relations of the parties. Under California law, an agent need not hold himself out as an agent to bind a principal. *Porter v. Arthur Murray, Inc.*, 249 Cal. App. 2d 410, 420 (Cal. Ct. App. 1967) ("one may be the agent of another without holding himself out to be such agent."). Similarly, a contract is enforceable against a principal even though the principal is not a named party to the instrument.[9]

California Civil Code § 2299 provides: "[A]n agency is actual when the agent is really employed by the principal."[10] Actual authority "is such as a principal intentionally confers upon the agent, or intentionally, or by want of ordinary care, allows the agent to believe himself to possess." Cal. Civ. Code § 2316 (2008).

Ait, the CEO and a director of the subsidiary Site/Tech as well as the parent company Site Tech, executed a conveyance transferring the patents-in-suit to Egger. *Ex. 24.* This represents an explicit written directive from an authorized agent of Site/Tech for Site Tech to convey the patents in the name of Site Tech to Egger, thereby creating a special agency between

---

[9] The fact that the 1998 Bill of Sale and Assignment is in the name of Site Tech is not an obstacle to applying California agency law to bind Site/Tech. *Sterling v. Taylor*, 152 P.3d 420, 430 (Cal. 2007) (omission of the actual owner of the properties from contract for the sale of land was permissible because a contract made in the name of an agent may be enforced against an undisclosed principal); *Sumner v. Flowers*, 279 P.2d 772, 774 (Cal. Ct. App. 1955) ("'The contract of the agent is the contract of the principal, and he may sue or be sued thereon, though not named therein....,'" quoting *Ford v. Williams*, 62 U.S. 287, 289 (1858)). California law has no prohibition against allowing agents to transact in their own name in cases of special agencies—and the agency at issue is a special agency to sell the patents-in-suit, not one of general terms. Cal. Civ. Code §§ 2297, 2322 (2008). Furthermore, when an agent is vested with control over the property and the right to receive payment for that property, the agent has "ostensible authority to deal with the property of his principal as his own," including transacting in his own name. Cal. Civ. Code §§ 2026, 2069 (2008); *see Pacific Fin. Corp. v. Foust*, 285 P.2d 632, 634-35 (Cal. 1955) (finding that the principal is bound under California Civil Code Section 2069 despite the agent's transacting in his own name). Accordingly, under agency principles, Site/Tech was bound as a party to the 1998 Bill of Sale and Assignment and transferred legal title to Daniel Egger.

[10] Because Site Tech was a California company, California law applies to determine agency. Restatement (Second) of Conflicts of Laws § 292(2) ("local law of the state where the agent dealt with the third person").

the entities for the purpose of selling the patents.[11] *See id.* §§ 2297, 2299. Furthermore, Ait has declared that it was the intent of both entities to transfer the patents to Daniel Egger and that Site/Tech had authorized Site Tech to convey the patents to Egger in its own name through the 1998 Bill of Sale. *Ex. 7,* ¶¶ 6-7. As such, Site/Tech is bound as a party to the 1998 Bill of Sale and Assignment, and the patents-in-suit were conveyed to Egger. *See Kothmann Enters., Inc. v. Trinity Indus., Inc.,* 394 F. Supp. 2d 923, 941-42 (S.D. Tex. 2005).[12]

Furthermore, Site Tech owned 100% of the outstanding stock of Site/Tech. *Ex. 21; Ex. 22; Ex. 7,* ¶ 2. Thus, Site Tech, as a 100% shareholder, had the power and authority to transfer the assets of Site/Tech, further strengthening the conclusion that Site Tech was an agent for Site/Tech. *See also* Del. Code Ann. tit. 8, § 271(a) & (c) (2008)[13] (indicating that every corporation has the right to "lease or exchange all or substantially all of [the] property and assets" of its wholly owned subsidiaries).[14]

> *(ii)    Site Tech also had the ostensible or apparent authority to transfer the patents-in-suit.*

Site/Tech also is bound to the 1998 Bill of Sale and Assignment under the doctrine of ostensible or apparent authority.

California Civil Code Section 2317 provides: "Ostensible authority is such as a principal, intentionally or by want of ordinary care, causes or allows a third person to believe the agent to

---

[11] At a minimum, it would also represent a failure of ordinary care by Site/Tech allowing Site Tech to believe it had the authority of Site/Tech to transfer the patents to Daniel Egger, which would also create actual authority by the subsidiary for the parent to transfer the patents to Daniel Egger.

[12] Courts have bound a corporation to the acts of an affiliated company if the intent of the parties was clear. In *Kothmann Enterprises,* the Court granted summary judgment in favor of the plaintiff regarding ownership of a patent, even though the plaintiff had obtained a written assignment of rights from an affiliated corporation that did not yet possess legal title. 394 F. Supp. 2d at 941-42. The court relied on evidence that both corporations had a single, common owner, and it was clear from the documents that the owner intended to transfer rights in patent to plaintiff. Here, the same intent of the parties is clear: Egger was to receive full legal title to the patents-in-suit in exchange for $100,000. *See Ex. 7,* ¶ 6.

[13] Delaware law applies because Site/Tech is a corporation duly formed and incorporated in Delaware.

[14] Further, "the property and assets of the corporation include the property and assets of any subsidiary of the corporation . . ." Del. Code Ann. tit. 8, §271(c) (2008).

possess." Under California law, a principal is bound by the acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without want of ordinary care, incurred a liability or parted with value, upon the faith thereof. Cal. Civ. Code § 2334 (2008).

Under the doctrine of apparent authority, a principal may be bound to a contract entered into by an actor who was not considered an agent by the principal at the time if the principal made manifestations that would cause a third party to reasonably believe that the actor had authority to enter into the transaction.[15]

Site/Tech's repeated representations through Ait, Site/Tech's CEO, that Site Tech owned the patents-in-suit and had the authority to transfer those patents in its name created a reasonable belief by Egger that Site Tech had both the authority and the right to transfer the patents in its name. Having cloaked Site Tech with the authority to sell the patents in the 1998 Bill of Sale and Assignment, Site/Tech is bound to the 1998 Bill of Sale and Assignment. *See People Express Pilot Merger Comm. v. Texas Air Corp.*, 1987 WL 18450, *4 (D.N.J. 1987), *aff'd*, 958 F.2d 364 (3d Cir.), *cert. denied*, 506 U.S. 864 (1992) (finding that two parent companies acted

---

[15] Restatement of Agency (Third) § 2.03 (emphasis added) provides:

> Apparent authority is the power held by an agent *or other actor* to affect a principal's legal relations with third parties when a third party reasonably believes the actor has authority to act on behalf of the principal and that belief is traceable to the principal's manifestations. . . . *The definition in this section does not presuppose the present or prior existence of an agency relationship as defined in § 1.01.*

*See also Borders Online, LLC v. State Bd. of Equalization*, 129 Cal. App. 4th 1179, 1191 (Cal. Ct. App. 2005) (principal is bound by agency relationship regardless of its "subjective belief"); *Scholastic Book Clubs, Inc. v. State Bd. of Equalization*, 207 Cal. App. 3d 734, 737-38 (Cal. Ct. App. 1989) ("based on conduct and circumstances" agent acted with apparent authority by distributing offer sheets and forwarding orders to principal); *Dep't of Banking & Fin. v. Davis*, 416 N.W.2d 566, 569-70 (Neb. 1987) (undisclosed principal, the assignee of a mortgage, granted "the apparent authority to act as its agent" to original mortgagee by allowing original mortgagee "to represent itself as mortgagee with full ownership of the mortgage and the secured debt and full authority to service the debt"); *McDaniel v. Hensons', Inc.*, 493 S.E.2d 529, 530 (Ga. Ct. App. 1997) (jury question whether agent had either actual or apparent authority on behalf of undisclosed principal in contracting for improvements to land owned by principal); *Handy v. C.I.T. Corp.*, 197 N.E. 64, 67 (Mass. 1935) (automobile dealer who was in fact agent of undisclosed principal had apparent authority as to transactions in usual and ordinary course of business conducted with third party who reasonably believed agent to be owner).

with apparent authority to bind their subsidiaries because, in one instance, the negotiator was president of both the parent and the subsidiary, and in the other, the parent and the subsidiary had "sufficiently overlapping directorship, management, and employee staff.").

In a similar case, *Regency Centers, L.P. v. Civic Partners Vista Village I, LLC*, California law was applied to find an implied agency relationship to manifest the parties' intentions. 2008 WL 2358860, at *13 (Cal. Ct. App. June 11, 2008). In that case, Regency Centers, L.P. intended to exercise an option granted to it by Civic, and Civic was aware of Regency Centers, L.P.'s intentions. *Id.* Regency Centers, L.P. sent a letter to Civic on "Regency Centers *Corporation*" letterhead, however, exercising the option in the name of "RRG" – Regency *Realty Group, Inc.*, an affiliate of Regency Centers, L.P. *Id.* Civic argued that Regency Centers, L.P. was not a party to the contract. *Id.* The trial court disagreed, and the California Court of Appeals affirmed. Both courts looked beyond the specific names in the contract to the intentions of the parties and the surrounding circumstances. As the trial court stated,

> Here, RRG exercised the option RCLP had been assigned the real property, and I believe that, in effect, that would be tantamount to a typographical error.... Here, in effect, I would find that RRG was an implied agent of RCLP. There was no confusion, no surprise, no effect upon the defendants whatsoever, and otherwise, it would elevate form over substance beyond belief.

*Id.* Affirming the trial court, the court of appeals continued,

> The trial court's reformation of the notice of intent to exercise the option did not change the agreement. The court merely corrected the notice to reflect the agreement and assumption that the Regency entity which owned the interest in the company, RCLP, sent notice it intended to exercise the option.

*Id.* at *14. In this case, Site/Tech is bound to the Bill of Sale and Assignment under agency principles given the authority that Site/Tech invested in Site Tech.

Under California law, "[a]n agency may be created, and an authority may be conferred, by ... a subsequent ratification." Cal. Civ. Code § 2307 (2008).  In addition to having an agent of the corporation signing the instrument warranting title of the patents-in-suit in the parent, Ait (and therefore Site/Tech) physically delivered the V-Search computer code and other goods that were the subject of the 1998 Bill of Sale to Daniel Egger, thereby evidencing a ratification by Site/Tech of the 1998 Bill of Sale and Assignment.[16]  Ait also has declared that Site/Tech believed it was bound by the 1998 Bill of Sale and Assignment and had ratified the acts of Site Tech and the obligations of the 1998 Bill of Sale and Assignment. *Ex. 7*, ¶¶ 5, 6, 7.  Ait also has explicitly ratified the 1998 Assignments and the 2005 Assignment in writing.   *Ex. 7*, ¶ 7; *see also* SEC statements, *Ex. 17*.  As such, Site/Tech is bound as a party to the Bill of Sale and the Assignment, and the patents-in-suit were conveyed to Egger.

## B.    The undisputed facts demonstrate that, at the latest, Egger acquired the patents in December 2000.

Site/Tech was merged into Site Tech on December 21, 2000, when it was formally merged into Site Tech. *See Exs. 29-31*.  This merger operated to convey any assets remaining in Site/Tech into Site Tech, including any residual rights in the patents-in-suit, if they existed.[17]  Even Defendants explicitly concede in their Motion that the assets of Site/Tech—specifically

---

[16] California Civil Code Section 2311 states, "RATIFICATION OF PART OF A TRANSACTION. Ratification of part of an indivisible transaction is a ratification of the whole." Cal. Civ. Code § 2311 (2008); *Scholastic Book Clubs*, 207 Cal. App. 3d at 737 ("By accepting the orders, the payment and shipping the merchandise shipping the merchandise appellant clearly and unequivocally ratified the acts of the teachers [implied agents] and confirmed their authority as appellant's agents or representatives.").

[17] *See Morrow*, 499 F.3d at 1338 n.3 (Fed. Cir. 2007) ("The patent statutes allow the instrument that assigns 'any interest' to take the form of a patent license or any other written instrument that transfers patent rights. The type of written instrument (e.g., license or assignment agreement, dissolution agreement, or *merger agreement*) and the factual context in which the instrument is created is irrelevant-this does not provide a basis for divorcing the standing analysis from the patent statutes.") (emphasis supplied).

including the patents-in-suit—were transferred in full to Site Tech pursuant to this 2000 merger, and resided in Site Tech as of December 2000:

- "As a consequence of the December 2000 merger documents, all the assets of [Site/Tech] – including title to the patents-in-suit – would have become the property of the surviving entity, [Site Tech]." Defendants' Motion, at 5.

- "Furthermore, all of Libertech's property would have been subsumed by the entity emerging from the merger, Deltapoint, a California corporation. *See* Cal. Corp. Code § 1107(a) and at page 5 above. Thus, after the merger on December 21, 2000, Deltapoint (a.k.a. Site Technologies, Inc.) would have owned the patents-in-suit." *Id.*, at 11.

Under the longstanding doctrine of after-acquired title, where an assignor of patents later acquires legal title to them, the patents immediately convey to the assignee upon the assignor's subsequent acquisition of the patents. This has been the law for well over a century. In *Gottfried v. Miller*, the assignor sold the assignee a patented machine, thereby "warrant[ing] not only the title to the machine itself, but the right to use it." 104 U.S. 521, 527 (1881). The assignor "did not acquire any interest in the patent until long after the date of his sale to [the assignee]," however. *Id.* The Supreme Court held that the assignor's after-acquired title inured to the assignee. *See id.* The Supreme Court held that the assignor's "previous sale to [the assignee] of a machine embodying his patented invention ... estopped him from prosecuting [the assignee] for an infringement of the patent by the use of the machine.... [The assignee] ... acquired a right to use the machine which could not have been controverted by [the assignor]." *Id.*

Similarly, in the 1951 case of *Taylor Engines, Inc. v. All Steel Engines, Inc.*, the assignors assigned an exclusive license to the assignee. 192 F.2d 171, 173 (9th Cir. 1951). Only later did the assignors acquire the actual right to exclusively license the patents. *Id.* The Ninth Circuit held that the assignor's after-acquired title inured to the assignee.

We ... base our decision on the broad equitable principle that where one purports, for value, to convey title to personal property which he does not own, ... [and] the

grantor subsequently acquires such title to personalty[,] equity will enforce the grantee's interest to prevent unjust enrichment of the grantor.

*Id.* at 174.

This principle has been consistently recognized. *See, e.g., Brush Elec. Co. v. Cal. Elec. Light Co.*, 52 F. 945, 963-64 (9th Cir. 1892) ("The sale of a patent right contains an implied warranty as to title, and an after-acquired title obtained by the vendor inures to the vendee."); *Faulks v. Kamp*, 3 F. 898, 901-02 (S.D.N.Y. 1880) ("It is a familiar law, and has been for a long time, that a warranty of title or right draws to it any after-acquired right or title of the warrantor, and carries it to the benefit of the person to whom the warranty runs. So whatever right, if any, the defendants acquired to the invention covered by this patent, enured directly to the benefit of the [buyers]."); *Curran v. Burdsall*, 20 F. 835, 836 (N.D. Ill. 1883) (following *Gottfried* and *Faulks*); *cf. Mills Novelty Co. v. Monarch Tool & Mfg. Co.*, 49 F.2d 28, 31 n.3 (6th Cir.) ("where a pending- or contemplated-patent application is assigned, but later the patent somehow issues to the inventor assignor, he would hold the legal title in trust for the earlier assignee, particularly as the monopoly was not in existence when the first assignment was made; and there are many cases applying this principle to rights in inventions."), *cert denied*, 284 U.S. 662 (1931). In 125 years, this principle has never been overruled.

Thus, even assuming this Court rejected all the previously discussed independent grounds for finding that Site Tech transferred the patents in 1998, and instead agreed with Defendants that Site Tech first acquired the patents in December 2000, Egger acquired the patents at that time—over four years before he conveyed them to SRA. Site Tech had specifically warranted in 1998 that it was transferring "good and marketable title," that it was the "sole owners," and that it had "full right to convey the entire interest" in the patents. *Ex. 24.* This result is consistent with the principles of estoppel and fraud underlying the after-acquired title doctrine—were Site

Tech permitted to take $100,000 from Daniel Egger, warrant title and nonetheless keep title following the merger, the result would be an injustice on the parties, and intended by none of them. If, as Defendants assert, the 1997 acquisition itself did not convey title to Site Tech, as intended by the officers, directors and shareholders of Site/Tech and Site Tech, the 2000 merger did. Upon the merger of Site/Tech into Site Tech, any remaining rights in the patents-in-suit conveyed immediately to Egger. Accordingly, Egger unquestionably obtained full legal title as of December 2000, well before his assignment to SRA in 2005 and the filing of this lawsuit. SRA thus has full legal standing, and Defendants' Motion should be denied.

**C.      Defendants misrepresent the February 2005 Assignment from Site/Tech to Egger.**

Defendants accuse Daniel Egger of fraud and improper intent regarding the execution of and claimed reliance on an assignment between Site/Tech and Egger executed on February 11, 2005 (the "2005 Assignment"). As a threshold matter, this assignment is irrelevant to the issues raised by Defendants' motion, because SRA does not rely on it to establish its chain of title.

But moreover, the 2005 Assignment was fully approved and ratified by Site/Tech, and it has been confirmed by Site/Tech that the 2005 Assignment fairly represented the intent of the parties and the transaction. *See Ex. 7*, ¶¶ 7-8. Defendants' reckless allegations of fraud relating to the 2005 Assignment are also directly contradicted by the sworn testimony of Christopher Lynch, the attorney who drafted and advised Egger to execute and file the 2005 Assignment. *Ex. 32*, ¶¶ 2-6. The purpose of filing the 2005 Assignment was not to correct any defect in the name of the party on the instrument, as Defendants erroneously allege. *Id.*, ¶ 3. Neither Lynch nor Egger recognized any defect at the time of the 2005 Assignment. *Id.* Rather, the 2005 Assignment was filed and recorded as replacement for the then-lost 1998 Assignment. When the 1998 bill of sale and assignment was eventually located, it was filed in July 2006. *Id.*

**D.    Defendants' assertion that the Site Tech bankruptcy extinguished Egger's rights to the patents-in-suit is wrong.**

Defendants appear to assert that Egger's rights to the patents-in-suit were somehow extinguished during Site Tech's bankruptcy proceedings. This assertion also is incorrect for multiple reasons:

1.    If Site/Tech held the patents, then bankruptcy did not defeat Egger's rights.

Assuming that Defendants are correct that the subsidiary Site/Tech held the patents during 1999 and through June 15, 2000, the patents were not part of the Site Tech bankruptcy estate; a wholly-owned subsidiary's property is not part of the parent's estate for bankruptcy purposes, where only the parent is in bankruptcy. *See In re Holywell Corp.*, 118 B.R. 876, 879 (S.D. Fla. 1990) ("In general, and absent unusual circumstances, the property of a debtor's subsidiary is not considered property of the debtor by virtue of the debtor's sole ownership of the subsidiary."). Following the merger in December 2000, the assets of Site Tech's subsidiary (which was not a debtor in the bankruptcy case) would not have become property of the estate, subject to the jurisdiction of the bankruptcy court. *In re Network Cancer Care, L.P.* 197 Fed. Appx. 284, 285 (5th Cir. 2006) (finding that a bankruptcy court's jurisdiction is more limited post-confirmation and generally exists for "matters pertaining to the implementation or execution of the plan").

2.    If Site Tech held the patents, then bankruptcy did not defeat Egger's rights.

Assuming that the parent Site Tech had held the patents before bankruptcy, the 1998 sale and assignment already had occurred and Site Tech (and Site/Tech) no longer owned the patents-in-suit. In numerous contexts, from SEC filings to its bankruptcy schedules, Site Tech represented that it did not own the patents, but rather, had assigned them to Daniel Egger. Indeed, the Disclosure Statement to the Plan that Defendants rely upon to argue that the

bankruptcy divested Egger of his ownership rights explicitly recognized the transfer to Daniel Egger. *Ex. 26*; *see Ex. 34* ("In September, the Company also sold its V-Search technology and related patents."). Similarly, the Schedules did not list the patents as property of the estate, even though it listed nearly every other IP asset that the company owned. *Ex. 35*. Likewise, Site Tech bankruptcy documents expressly listed all the "core technology assets" the company owned; the list nowhere included the patents-in-suit. *Ex. 36*. This further evidences an intent to abandon the property to Daniel Egger. Confirmation of the plan is *res judicata* that the property was not in the estate and had belonged to Daniel Egger. Furthermore, Egger, who would have been a creditor of Site Tech's given Defendants' allegations, had no notice whatsoever that Site Tech purportedly contested its conveyance to him—which it did not—and claimed to still own the patents-in-suit. The patents-in-suit were not part of Site Tech's bankruptcy estate.

In addition, Egger was not given notice of the bankruptcy as a creditor, and the patents were not listed on the bankruptcy schedules as assets of the bankruptcy estate. Under those circumstances, the bankruptcy proceeding cannot act to divest Egger of rights under the bill of sale and assignment. It is well-settled that "the bankruptcy code cannot be construed to effectively divest someone of property which is rightfully theirs." *Curtis Mfg. Co., Inc. v. Plasti-Clip Corp.*, 933 F. Supp. 107, 114 (D.N.H. 1995), *rev'd on other grounds*, 135 F.3d 778 (Fed. Cir. 1998) (internal modifications omitted). Under 11 U.S.C. § 541, a debtor cannot bring into the estate equitable title to a patent that it does not own. *See id.* "Because the debtor does not own an equitable interest in property he holds in trust for another, that interest is not 'property of the estate.'" *Begier v. IRS*, 496 U.S. 53, 59 (1990); *see also* 11 U.S.C. § 541(d); *In re Shepard*, 29 B.R. 928, 932 (Bankr. M.D. Fla. 1983) ("[W]here a debtor holds only bare legal title to property without any equitable interest, bare legal title is all that becomes property of the estate.").

In 1999 and through June 15, 2000, Site Tech did not hold both legal and equitable title to the patents-in-suit. Specifically, because Site Tech already had contracted and conveyed the patents-in-suit to Egger, Site Tech had transferred equitable title to Egger. Under such circumstances, nothing in Site Tech's bankruptcy proceedings could have extinguished Egger's rights to the patents-in-suit. As one court put it, "a bankruptcy court's jurisdiction [to determine rights] does not extend to property that is not part of a debtor's estate." *Rutherford Hosp., Inc. v. RNH P'ship*, 168 F. 3d 693, 699 (4th Cir. 1999).

Further, in their Motion, Defendants emphasize that Section 14.2 of the Plan provides that the Debtors' assets again vested "free and clear of any liens, claims, encumbrances, Claims of Creditors and Interests of Equity Security Holders." The relevant language provides only that no claims or liens attach to the property itself. *See In re Penrod*, 50 F.3d 459, 463 (7th Cir.1995) (holding that section 1141(c) covers liens and "that unless the plan of reorganization, or the order confirming the plan, says that a lien is preserved, it is extinguished by the confirmation"); *In re Worldcom Corp.*, 382 B.R. 610 (Bankr. S.D.N.Y. 2008) (same); *In re Regional Bldg. Sys.*, 251 B.R. 274, 287 n.21 (Bankr. D.Md. 2000) ("discharge impacts only the collection of the debt 'as a personal liability of the debtor,'" whereas § 1141(c) restricts "collection of the debt via enforcement of a lien"). The Plan does not provide that claims are voided against a debtor. Given that Site Tech did not have title to the patents during the bankruptcy, having transferred title to Egger, the only relevant property of the estate would be the underlying contracts. SRA does not assert a lien on those rights. It merely seeks to assert that *in personam* rights exist against the post-confirmation debtor.

Moreover, Egger's claim to the patents-in-suit would survive the bankruptcy under the very terms of Site Tech's plan of reorganization. Section 14.3 of that plan stated, "Due to the liquidating nature of this Plan and pursuant to Bankruptcy Code 1141(d)(3), the entry of the

Confirmation Order shall not act as a discharge of any debt of the Debtor that arose prior to Confirmation, except to the extent that such debt is paid under the Plan." *Ex. 27.* In other words, contrary to Defendants' supposition, Egger's claim to the patents was not discharged by the bankruptcy.[18] To the extent that the claim was not paid under the plan—which it indisputably was not—it survived the bankruptcy.

Finally, even if the bill of sale and assignment were somehow rejected in the bankruptcy proceeding, "the parties to the contract can waive the breach and reinstate the contract, just as they could under state law." *In re Lockwood*, 2008 WL 943025, *4 n.5 (Bankr. N.D. Cal. Apr. 7, 2008). In this case, and after the bankruptcy, Site Tech has confirmed by its actions and the declaration of its CEO that its intent was to sell and assign the patents-in-suit to Egger. *Ex. 7*, ¶¶ 5 and 6.

Thus, Egger acquired the patents-in-suit no later than December 2000.

## IV.    CONCLUSION

Defendants' Motion is without merit; the patents-in-suit were properly transferred, and SRA has full legal standing to bring this action. In essence, the Motion asks the Court to undo a host of transactions. It is more than an assertion of a technical defect in title—it avers that the patents-in-suit have somehow dissipated into the ether, so that Defendants' infringement can never be challenged. Such claims should be rejected, and have been rejected when raised elsewhere:

> [The accused infringer's] only defense states that before the '994 patent issued, [the inventor] assigned equitable future rights in his invention to his research laboratory, and that those equitable rights got lost when [the laboratory] dissolved. It would be unfair to allow [the accused infringer] to hide behind the

---

[18] Defendants make much of the fact that, under Section 14.2 Site Tech's plan of reorganization, "[a]ll property of the Debtor, *except as otherwise provided in this Plan*, shall be free and clear of any liens, claims, encumbrances, Claims of Creditors and Interests of Equity Security Holders." This provision does not contradict Section 14.3 of Site Tech's plan of reorganization. To the contrary, it expressly carves out an exception for the rights "otherwise provided in this Plan," including debts not paid under the plan.

putative rights of a nonparty, especially where, as here, neither side contends that such a party exists.

> The law favors ownership of patents, and while that ownership may be gossamer as in the case at bar, it has not devolved, as [the accused infringer] says, on an unidentified third party.

*Kahn v. Gen. Motors Corp.*, 33 U.S.P.Q.2d 2011, 2014 (S.D.N.Y. 1995), *aff'd*, 77 F.3d 457 (Fed. Cir. 1996).

For the reasons enumerated above, SRA asks that Defendants' Motion be denied in its entirety, and for such other and further relief to which it may show itself entitled.

Respectfully submitted,

Lee L. Kaplan
LEAD ATTORNEY
State Bar No. 11094400
**SMYSER KAPLAN & VESELKA, L.L.P.**
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2323
(713) 221-2320 (fax)
lkaplan@skv.com

Victor G. Hardy
State Bar No. 00790821
(Requesting Admission *Pro Hac Vice*)
Andrew G. DiNovo
State Bar No. 00790594
Adam G. Price
State Bar No. 24027750
Jay D. Ellwanger
State Bar No. 24036522
**DiNovo Price Ellwanger LLP**
P.O. Box 201690
Austin, Texas 78720
(512) 681-4060
(512) 628-3410 (fax)
vhardy@dpelaw.com

*Of counsel:*

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
**CAPSHAW DERIEUX**
1127 Judson Road, Suite 220
P.O. Box 3999
Longview, TX 75606-3999
(903) 236-9800
(903) 236-8787 (fax)
ccapshaw@capshawlaw.com

Robert M. Parker
State Bar No. 15498000
Robert C. Bunt
State Bar No. 00787165
Charles Ainsworth
State Bar No. 0078352
**PARKER, BUNT & AINSWORTH, P.C.**
100 East Ferguson, Suite 1114
Tyler, Texas 75702
(903) 531-3535
(903) 533-9687 (fax)

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on August 25, 2008.

Lee L. Kaplan