## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TEXAS
## MARSHALL DIVISION

| | | |
|---|---|---|
| SOFTWARE RIGHTS ARCHIVE, LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | Civil Action No. 2:07-cv-511-TJW |
| v. | § | |
| | § | |
| GOOGLE INC., YAHOO! INC., | § | |
| IAC SEARCH & MEDIA, INC., AOL LLC, | § | JURY TRIAL DEMANDED |
| and LYCOS, INC., | § | |
| | § | |
| Defendants. | § | |

### PLAINTIFF'S SUR-RESPONSE TO DEFENDANTS' MOTION TO DISMISS

### TABLE OF CONTENTS

PAGE

TABLE OF CONTENTS .......................................................................................... i

TABLE OF AUTHORITIES ................................................................................... iii

I.     INTRODUCTION ........................................................................................... 1

II.    ARGUMENT AND AUTHORITIES ............................................................ 2

     A.    As a Matter of Law, Egger Acquired the Patents in September 1998, When He Executed a Bill of Sale and Assignment with Site Tech .................................................................................................. 2

         1.    The Northern District of California Bankruptcy Court has already found that Egger acquired the patents from Site Tech in September 1998, and reconsideration of this finding is barred by res judicata. ....................................... 2

             a.    Under the doctrine of res judicata, it is settled as a matter of law that Egger acquired the patents in September 1998. .................................................. 2

             b.    Defendants' argument that res judicata does not apply because there was no adversary proceeding is wrong. ................................................. 6

i

c.   Defendants' argument that Paragraph 14.2 of
the bankruptcy plan somehow overrules the
bankruptcy court's confirmation of Egger's
ownership is also wrong...................................................6

2.   Site Tech owned the patents in September 1998, because
it had acquired them from Site/Tech in July 1997 by
operation of the liquidation provision in Site/Tech's
charter.............................................................................7

a.   The Northern District of California Bankruptcy
Court has already found that Site Tech acquired
the patents from Site/Tech in July 1997, and
reconsideration of this issue is barred by res
judicata.............................................................7

b.   The terms of the liquidation provision
demonstrate that it effectuated an automatic
transfer of the patents to Site Tech. ...........................9

3.   Even if the patents belonged to Site/Tech in September
1998, as Defendants claim, Egger still would have
acquired the patents at that time, because Site/Tech was
bound by the Bill of Sale and Assignment. ............................11

a.   Site/Tech was Site Tech's alter ego in September
1998.................................................................11

b.   Site Tech was Site/Tech's authorized agent for
purposes of transferring the patents to Egger...........14

B.   Even If Egger Did Not Acquire the Patents in September 1998,
He Acquired Them as a Matter of Law in December 2000,
When Defendants Claim Site Tech Acquired Title Thereto. ...........................15

1.   Defendants' claim that title does not pass immediately
and automatically to the assignee under the after-
acquired title doctrine is wrong..............................................15

2.   Defendants' claim that the bankruptcy extinguished
Egger's rights is wrong.........................................................16

a.   The Bill of Sale and Assignment were not
executory contracts and were not rejected in the
Site Tech bankruptcy.............................................16

b.   Even if the Bill of Sale and Assignment were
rejected in the Site Tech bankruptcy, that still
would not extinguish Egger's right to the legal
title to the patents.................................................18

3.   Defendants' claim that Egger's supposedly unclean
hands bar application of the after-acquired title

doctrine mischaracterizes Egger's actions, ignores
fundamental requirements of the unclean hands
doctrine, and flies in the face of equity. ...................................22

III.   **CONCLUSION** ....................................................................... 25

# TABLE OF AUTHORITIES

**Cases**
*Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796-97 (5th Cir. 1999) ............................. 24
*American Bankers Ins. Co. of Florida v. Maness*, 101 F.3d 358, 362 (4th Cir. 1996) ................. 21
*Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1576 (Fed. Cir. 1991) ............................. 19
*Burk Royalty Co. v. Robbins Title Ptr*, 117 F.3d 1417 (5th Cir. 1997) ...................................... 19
*Bush v. Person*, 59 U.S. 82 (1855)................................................................................................ 20
*Calderon v. Commodore Holdings Ltd.*, 2004 WL 385062, at *1 (S.D.N.Y. Mar. 1, 2004) ....... 21
*Cent. Trust Co. v. Shepard*, 29 B.R. 928, 932 (Bankr. M.D. Fla. 1983) .................................... 20
*Cherry v. Farmers Royalty Holding Co.*, 160 S.W.2d 908, 910 (Tex. 1942)............................... 15
*Chevron U.S.A., Inc. v. State*, 993 So.2d 187, 2008 WL 4118905, at *14 n.4 (La. Sept. 8, 2008)
...................................................................................................................................................... 15
*Coastal Plains, Inc. v. Mims*, 179 F.3d 197, 205 (5th Cir. 1999)................................................. 2
*Curtis Mfg. Co., Inc. v. Plasti-Clip Corp.*, 933 F. Supp. 94 (D.N.H. 1995) ............................. 20
*Faulks v. Kamp*, 3 F. 898, 901-02 (S.D.N.Y. 1880) .................................................................. 19
*Frain v. Burgett*, 50 N.E. 873, 876 (Ind. 1898) ......................................................................... 15
*Greenley Energy Holdings of Penn. v. Stone*, 110 B.R. 173, 180 (Bankr. E.D. Penn 1990)........ 21
*Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783-84 (9th Cir. 2001) ......................... 2
*Haw v. Graue*, 158 B.R. 965, 970(S.D. Tex. 1993).................................................................... 21
*Horton v. Rehbein*, 60 B.R. 436, 440-42 (9th Cir. 1986)........................................................... 17
*In re Aimster Copyright Litigation*, 252 F.Supp.2d 634, 655 (N.D.Ill. 2002) ............................. 24
*In re Allen*, 300 F.3d 1055, 1059 (9th Cir.2002) ....................................................................... 21
*In re Barker-Fowler Electric Co.*, 141 B.R. 929, 938 (Bankr. W.D. Mich. 1992)........................ 21
*In re Belmonte*, 240 B.R. 843, 851 (Bankr. E.D. Pa 1999); *In re Walker*, 227 B.R. 870, 872
(Bankr. S.D. Ind. 1998)................................................................................................................ 17
*In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458 (6th Cir. 1991) .................................. 2
*In re Encinas*, 27 B.R. 79, 80-81 (Bankr. D. Or. 1983)............................................................ 20
*In re Forklift LP Corp.*, 363 B.R. 388, 397 (Bankr. D. Del. 2007) ............................................. 5
*In re Golden Plan of California, Inc.*, 829 F.2d 705 (9th Cir. 1986).............................................. 6
*In re Hakim*, 244 B.R. 820, 822 (Bankr.N.D.Cal.1999) ............................................................ 21
*In re Int'l Nutronics, Inc.*, 28 F.3d 965, 969 (9th Cir. 1994); *Tally v. Fox Film Corp.*, 88 F.2d
212, 223 (9th Cir. 1937)................................................................................................................ 2
*In re Kane*, 248 B.R. 216, 224 (B.A.P. 1st Cir. 2000)............................................................... 17
*In re Marriage of Perkins*, 2004 WL 112598, at *2 (Tex. App.—Amarillo Jan. 23, 2004)......... 18
*In re Miller*, 253 B.R. 455, 459 (Bankr. N.D. Cal. 2000) .......................................................... 5
*In re Pardee*, 193 F.3d 1083, 1087 (9th Cir. 1999) .................................................................... 2
*In re Snug Enters.*, 169 B.R. 31, 33 (Bankr. E.D. Va. 1994)....................................................... 5
*In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 363 and fn. 15 (E.D. Pa. 1996) ............................. 3

*In the Matter of Howe*, 913 F.2d 1138, 1147 (5th Cir. 1990)........................................................ 2

*Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) ............................................................ 25

*Kahn v. Gen. Motors Corp.*, 77 F.3d 457, 458-59 (Fed. Cir. 1996) ............................................ 19

*Keystone Driller Co. v. Gen. Excavator Co.,* 290 U.S 240 (1933)............................................ 25

*Ligon v. City of Detroit*, 739 N.W.2d 900, 906 (Mich. App. 2007) .......................................... 18

*Matter of Quality Holstein Leasing*, 752 F.2d 1009 (5th Cir.1985)............................................ 20

*Matter of TTS, Inc.*, 158 B.R. 583, 584 (D. Del. 1993) ............................................................ 20

*Mills Novelty Co. v. Monarch Tool & Manuf. Co.* ................................................................ 16

*Mitchel v. Streets*, 882 F.2d 233 (7th Cir. 1989)...................................................................... 17

*Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979) .......... 24

*Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1337 (Fed. Cir. 2007)...................................... 6, 18

*Old Republic Insurance Co. v. Currie*, 665 A.2d 1153, 1155 (N.J. Super. Ch. 1995) ................. 21

*Palmer v. Vogel*, 57 B.R. 332 (Bankr W.D. Vir. 1986).......................................................... 21

*Pauley Petrol. Inc. v. Continental Oil Co.*, 239 A.2d 629, 633 (Del. 1968).............................. 13

*Pharm-Eco Lab., Inc. v. Immtech Int'l, Inc.*, No. Civ. A. 18246, 2001 WL 220698 (Del. Ch.
    Feb.26, 2001) ................................................................................................................ 10

*Roberts v. Roberts*, 241 Fed. Appx. 420, 421-22 (9th Cir. 2007)............................................. 2

*Rudaw/Empirical Software Prods. Ltd. v. Elgar Elecs. Corp.*, 83 B.R. 241, 246 (Bankr. S.D.N.Y.
    1988) ............................................................................................................................ 19

*Security Pacific Mortg. and Real Estate Services, Inc. v. Canadian Land Co.*, 690 F.Supp. 1214,
    1224 (S.D.N.Y. 1988) .................................................................................................... 24

*Stroh v. Grant*, 34 Fed. Appx. 562, 565 (9th Cir. 2002)......................................................... 2

*Superior Crewboats, Inc. v. Primary P & I Underwriters*, 374 F.3d 330, 334 (5th Cir. 2004) ..... 2

*Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995)............................................................ 2, 7

*U.S. v. Compean*, 2006 WL 1737536, at *3 (S.D. Tex. June 23, 2006) ................................... 20

*U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983) .......................................................... 20

*U.S., Dep't of Air Force v. Carolina Parachute Corp.*, 907 F.2d 1469, 1474 (4th Cir. 1990)..... 21

*Univ. Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc.*, 960 F.2d 366, 371 (3rd Cir. 1992)20

## Statutes

11 U.S.C. § 1125 .......................................................................................................... 4

11 U.S.C.A. § 1142 ........................................................................................................ 21

11 U.S.C.A. § 541(a) ...................................................................................................... 21

35 U.S.C. § 261............................................................................................................ 6, 10

37 C.F.R. § 3.56........................................................................................................... 10

Bankruptcy Rule 7001 ..................................................................................................... 6

Cal § 2309 .................................................................................................................. 15

Del. Gen. Corp. Law §§ 275-285...................................................................................... 11

Plaintiff Software Rights Archive, LLC ("SRA") files this Sur-Response to Defendants' Motion to Dismiss.

# I. __INTRODUCTION__

The dispositive question regarding standing in this case is this: Did Daniel Egger acquire the patents-in-suit? The answer, *as a matter of law*, is yes:

- As a matter of law, Egger acquired the patents in September 1998, when he executed a Bill of Sale and Assignment with Site Technologies, Inc. ("Site Tech").

  - The Northern District of California Bankruptcy Court has already so found over eight years ago, and questions relating to a confirmed bankruptcy plan are barred from reconsideration by the doctrine of res judicata.

  - Every party with personal knowledge agrees that Egger acquired the patents from Site Tech in September 1998.

    - Daniel Egger: "I signed [the Bill of Sale and Assignment], Jeff [Ait] signed it, I paid him the money, I bought the patents . . . ." (Ex. 1, at 45.)

    - Jeffrey Ait: "On September 16, 1998, Site Tech sold and assigned, among other things, U.S. Patent No. 5,544,352, and related applications and future patents . . . to Daniel Egger." (Ex. 2, ¶ 5.) "At the time of the execution of the 1998 Bill of Sale and Assignment that assigned the Patents to Daniel Egger, I was the CEO of both Site Tech and Site/Tech and was fully authorized by both companies to assign the Patents to Daniel Egger." (Ex. 2, ¶ 6.) Furthermore, "After the July 11, 1997 acquisition, Site/Tech lacked any substantial independent operation or business from that of Site Tech. It did not design, produce, market, or sell anything, and it had no significant independent costs or revenues." (Ex. 2, ¶ 2.) "[T]hat's what I would classify as a shell." (Ex. 3, at 108.)

    - Site Tech: "On September 30, 1998 . . . [Site Tech] consummated the sale of its V-Search technology and related patents. . . . The Company sold the assets relating to V-Search in cash to Daniel [Egger]. The Company received a cash payment of $100,000." (Ex. 4.)

    - Site/Tech: "After the sale, neither Site Tech entity carried the Patents on their books and both recognized the validity of the 1998 Bill of Sale and Assignment . . . . Site/Tech . . . ratified the 1998 Bill of Sale and Assignment and Site Tech's authority and right to transfer the patents in those documents on behalf of all Site Tech entities a long time ago." (Ex. 2, ¶ 6.)

- As a matter of law, Egger acquired the patents at the latest in December 2000. Under the after-acquired title doctrine, if an assignor assigns property to an assignee without

having title and thereafter acquires title to the property, the property vests in the assignee at the moment that the assignor acquires title. Here, it is undisputed that Site Tech assigned the patents to Egger in September 1998 and that Site Tech at the latest acquired title to the patents in December 2000.

This issue is ripe for definitive resolution. This Court should find as a matter of law that Egger acquired the patents, SRA owns the patents, and SRA has standing to bring this case.

## II.   ARGUMENT AND AUTHORITIES

### A.   As a Matter of Law, Egger Acquired the Patents in September 1998, When He Executed a Bill of Sale and Assignment with Site Tech.

#### 1.   The Northern District of California Bankruptcy Court has already found that Egger acquired the patents from Site Tech in September 1998, and reconsideration of this finding is barred by res judicata.

##### a.   Under the doctrine of res judicata, it is settled as a matter of law that Egger acquired the patents in September 1998.

The law is well-settled: "Once a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect." *Trulis v. Barton*, 107 F.3d 685, 691 (9th Cir. 1995).[1] Likewise, statements in the debtor's schedules are conclusively binding on the debtor. *Superior Crewboats, Inc. v. Primary P & I Underwriters*, 374 F.3d 330, 334 (5th Cir. 2004) (reversing lower court's refusal to bar debtor's claim because debtor failed to list claim as asset on its bankruptcy schedules).[2]

---

[1] *See also In the Matter of Howe*, 913 F.2d 1138, 1147 (5th Cir. 1990); *In re Int'l Nutronics, Inc.*, 28 F.3d 965, 969 (9th Cir. 1994); *Tally v. Fox Film Corp.*, 88 F.2d 212, 223 (9th Cir. 1937) (barring relitigation of whether a pre-petition transaction violated securities law because the prior transaction was recognized by the Trustee and set forth in the bankruptcy petition); *In re Pardee*, 193 F.3d 1083, 1085 (9th Cir. 1999) ("Great Lakes' failure to object to the plan or to appeal the confirmation order constitutes a waiver of its right to collaterally attack the confirmed plan postconfirmation on the basis that the plan contains a provision contrary to [law]." (internal quotation marks omitted)); *In re Chattanooga Wholesale Antiques, Inc.*, 930 F.2d 458 (6th Cir. 1991) (holding that although bank was incorrectly treated as secured creditor under confirmed bankruptcy plan, payments made to bank were authorized under bankruptcy plan and were not avoidable).

[2] *See also Coastal Plains, Inc. v. Mims*, 179 F.3d 197, 205 (5th Cir. 1999); *Roberts v. Roberts*, 241 Fed. Appx. 420, 421-22 (9th Cir. 2007) (barring debtor from asserting that creditor lacked standing because debtor listed creditor in its schedules); *Stroh v. Grant*, 34 Fed. Appx. 562, 565 (9th Cir. 2002) (barring debtor from asserting that it owned an interest in a partnership after failing to list the partnership interest in its schedules); *Hamilton v. State Farm Fire & Cas. Co.*, 270 F.3d 778, 783-84 (9th Cir. 2001) (barring

Here, Defendants' entire standing challenge may be rejected as a matter of law based on this undisputed fact: Site Tech's bankruptcy filings repeatedly and explicitly represented to the bankruptcy court, to creditors, and to interested parties that neither it nor Site/Tech possessed any interest in the patents, but that Site Tech had transferred the patents to Egger in September 1998.[3] In its court-approved First Amended Disclosure Statement, Site Tech wrote, "In September 1998, the Company also sold its V-Search technology and related patents." (Ex. 5, § 5.5; Ex. 6, at 2.) Again, in its Statement of Financial Affairs, it listed under penalty of perjury:

**10. Other transfers**

None ☐ a. List all other property, other than property transferred in the ordinary course of business or financial affairs of the debtor, transferred either absolutely or as security within **one year** immediately preceding the commencement of this case. (Married debtors filing under chapter 12 or chapter 13 must include transfers by either or both spouses whether or not a joint petition is filed, unless the spouses are separated and a joint petition is not filed.)

| NAME AND ADDRESS OF TRANSFEREE, RELATIONSHIP TO DEBTOR | DATE | | DESCRIBE PROPERTY TRANSFERRED AND VALUE RECEIVED |
|---|---|---|---|
| Savoir Technology Group, Inc. 254 Hacienda Avenue Campbell, CA 95008 | 12/28/98 1/29/99 | $150,000 $ 50,000 | Security interest in all assets |
| Daniel Egger 2027 W. Club Blvd. Durham, NC 27705 | 9/15/98 | $80,000 | V-Search Technology |

(Ex. 7.) This is a verified statement that Egger acquired the patents before the bankruptcy and that the patents had belonged to Site Tech, not Site/Tech. Finally, in its Schedules, Site Tech deliberately excluded the patents-in-suit from the lists of current property of the estate, even though it included every other patent asset it acquired from Site/Tech. (Ex. 9, at 3.) Site Tech never amended its schedules following its merger with Site/Tech to reflect any claim of

---

debtor from asserting that it had a cause of action because it failed to list the policy as an asset on its bankruptcy schedules).

[3] In determining the provisions and meaning of a plan for purposes of res judicata, the court considers the disclosure statement and any other bankruptcy filings incorporated into the plan or confirmation order. *In re Sugarhouse Realty, Inc.*, 192 B.R. 355, 363 and n.15 (E.D. Pa. 1996) (citing multiple cases). The Plan (Ex. 8, at 1) specifically refers to the Disclosure Statement for a prior history of the Debtor's transactions and for the creditor in deciding whether to accept the plan.

ownership of the patents or any recognition that the patents became part of its bankruptcy estate. (Ex. 6.)

Thus, Site Tech's bankruptcy filings definitively raised the issue in the bankruptcy proceedings of who owned the patents, and the responsibility fell on Site/Tech and the other parties, to the extent they disagreed with Site Tech, of objecting to the bankruptcy plan and other filings and asserting that the transfer to Egger in September 1998 was defective and/or that someone other than Egger rightfully owned the patents. It is undisputed that neither Site/Tech nor anyone else objected to Site Tech's plan, disclosure statement, and schedules, and it is further undisputed that the Northern District of California Bankruptcy Court relied on the bankruptcy record and entered a confirmation order in the case.[4] This being so, as a matter of law the bankruptcy court order and other filings, along with the administration of the bankruptcy, bind Site Tech and Site/Tech and operate as a final judgment regarding Egger's acquisition of the patent in September 1998.[5] Further consideration of the issue is barred by res judicata.

Application of res judicata is particularly appropriate here because neither Site Tech nor Site/Tech has ever contested the September 1998 assignment to Egger. Rather, both have repeatedly affirmed the validity and operation of that transaction. Indeed, Jeffrey Ait, the CEO of Site Tech and Site/Tech and the Responsible Person under the Site Tech bankruptcy plan, has submitted testimony to these proceedings and executed further conveyances in support of Egger's ownership of the patents. Further, application of the doctrine is the only way to avoid manifest unfairness to Egger and to avoid violating Egger's bankruptcy and due process rights. Egger had a meritorious claim to the patents, having paid $100,000 for them and having received

---

[4] Notably, as required by 11 U.S.C. § 1125, the bankruptcy court had also previously approved Site Tech's disclosure statement as containing "adequate information" to enable creditors to decide whether to vote for or against the plan.

[5] Site/Tech was a creditor that approved the plan and was merged into Site Tech. (Ex. 10 (listing Site/Tech as a creditor).)

two warranty assignments to them. His acceptance of the plan and decision not to litigate ownership of the patents or seek modification of the plan was based on the fact that the bankruptcy plan and schedules all provided that the patents were transferred to him in 1998 and that no party in interest to the bankruptcy contested his ownership of them. Similarly, Egger's decision not to assert substantial claims against Site Tech for breach of contract and breach of title warranties, or alternatively, to assert his rights to the patents, was also based on the fact that the plan recognized his ownership of the patents. Failure to apply res judicata here would deny Egger notice that his patent rights were being challenged and would deny him an opportunity to assert his rights in the bankruptcy, to oppose or modify the plan, or to seek allowance of a claim against Site Tech for the substantial breach of contract/title warranty damages he suffered.[6]

In contrast, giving preclusive effect to the bankruptcy court's recognition that Egger had acquired the patents would create no unfairness to Site Tech's other creditors or interest holders, because all those parties were given notice of the assignment to Egger at all stages of the bankruptcy process. Furthermore, Site Tech's general unsecured creditors received payment in full, with additional funds flowing to equity. (Ex. 5.) Failing now to afford the preclusive effect to the Egger assignment would entitle Egger to a substantial claim against the estate for the failure to deliver his patents, threatening the significant recovery already received by creditors

---

[6] *In re Snug Enters.*, 169 B.R. 31, 33 (Bankr. E.D. Va. 1994); *In re Forklift LP Corp.*, 363 B.R. 388, 397 (Bankr. D. Del. 2007) (holding that it would be unfair to deprive creditors of their rights "where plan provisions do not explicitly take those rights away. If a plan explicitly puts a creditor on notice that it is in danger of losing its rights and the creditor fails to act to protect its rights, then rigid application of the plan seems justified. However, where it is more difficult or impossible for the creditor to realize that the Plan threatens its statutory rights, it is inequitable to punish the creditor for failing to object."); *In re Miller*, 253 B.R. 455, 459 (Bankr. N.D. Cal. 2000) (holding that if a confirmed bankruptcy plan is ambiguous as whether a debt is discharged, "[t]he ambiguity in the plan should be resolved against the Debtor because Debtor drafted the plan.").

and junior equity holders. (Ex. 6.)[7]

Therefore, it is settled under res judicata that Egger acquired the patents from Site Tech in September 1998. On this basis alone, this Court should rule as a matter of law that Egger owned the patents-in-suit, that SRA owns the patents, and that SRA possesses standing to bring this case.

**b.      Defendants' argument that res judicata does not apply because there was no adversary proceeding is wrong.**

Defendants assert that res judicata does not apply to Egger's ownership of the patents because no adversary proceeding occurred as to the issue. (Ex. 11, at 25.) Defendants are wrong. The case Defendants themselves cite, *In re Golden Plan of California, Inc.*, 829 F.2d 705 (9th Cir. 1986), as well as Bankruptcy Rule 7001, directly contradict Defendants' position. *Golden Plan* and Bankruptcy Rule 7001 only restrict a debtor or trustee from *setting aside* a creditor's (such as Egger's) property rights without giving the creditor an opportunity to defend himself in a proceeding. (This is a further significant reason why the bankruptcy plan could not have divested Egger of the patents.) Neither *Golden Plan* nor Bankruptcy Rule 7001 prevents a debtor from agreeing to *recognize* a creditor's valid property rights. Debtors and trustees routinely accept claims and liens and concede property rights when putting forward a plan, setting forth schedules of assets and transfers, abandoning property, and administering a bankruptcy. These determinations are conclusively binding on the debtor without any need for an adversary proceeding.

**c.      Defendants' argument that Paragraph 14.2 of the bankruptcy plan somehow overrules the bankruptcy court's confirmation of Egger's ownership is also wrong.**

---

[7] The writing requirement of 35 U.S.C. § 261 provides no obstacle to the transfer of patents by virtue of a bankruptcy, bankruptcy plan, or proceeding in equity. *See Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1337 (Fed. Cir. 2007).

Defendants argue that, despite the bankruptcy court's confirmation of Egger's rights, Paragraph 14.2 of the bankruptcy plan vests the patents in Site Tech free and clear of any claim by Egger. Defendants are wrong. Paragraph 14.2 provides that "all property of the debtor" will revest in the debtor free and clear of creditors' and interest holders' claims on the "Effective Date" of the plan. (Ex. 8., at 19.) The "Effective Date" of the plan was July 16, 2000.[8] Thus, Site Tech's property as of July 16, 2000 revested free and clear on that date. Defendants themselves admit, however, that Site Tech did not own the patents on July 16, 2000. Rather, under Defendants' argument, Site Tech acquired the patents only on December 21, 2000, when it merged with Site/Tech. (Ex. 12.) Paragraph 14.2 therefore could not have operated to vest the patents free and clear in Site Tech.

2. **Site Tech owned the patents in September 1998, because it had acquired them from Site/Tech in July 1997 by operation of the liquidation provision in Site/Tech's charter.**

a. **The Northern District of California Bankruptcy Court has already found that Site Tech acquired the patents from Site/Tech in July 1997, and reconsideration of this issue is barred by res judicata.**

As noted above, it is well-settled that "[o]nce a bankruptcy plan is confirmed, it is binding on all parties and all questions that could have been raised pertaining to the plan are entitled to *res judicata* effect." *Trulis*, 107 F.3d at 691. This principle mandates that this Court uphold the Northern District of California Bankruptcy Court's finding that the patents transferred in liquidation from Site/Tech to Site Tech in July 1997. Site Tech's bankruptcy disclosure statement expressly indicates that intellectual property of Site/Tech transferred to Site Tech through the July 1997 acquisition: "In July 1997, [Site Tech] acquired the technology to develop

---

[8] The plan defines the Effective Date as eleven calendar days after the Confirmation Date. (*Id.* at 6:25.) The Confirmation Order was entered on July 5, 2000. (Ex. 27.) Thus, the Effective Date was July 16, 2000.

SiteSweeper 2.0 . . . ." (Ex. 5. at § 5.4.) Further, Schedule B lists products, trademarks, and patents pertaining to SiteSweeper and SiteMarks that Site Tech acquired from Site/Tech:

| 21. Patents, copyrights, and other intellectual property. Give particulars. | | Intellectual property for QuickSite product, SiteSweeper product, SiteMaster product, WebTools product, SiteMarks product, WebAnimator product and Graphic Tools product Trademark held for SiteSweeper, applications pending for SiteMaster and QuickSite in Europe All source files for intellectual product resides at 380 El Pueblo Road, Scotts Valley, CA 95066 | | 1,000,000.00 | |

(Ex. 9, at 21.) Site Tech acquired these patents from Site/Tech before the bankruptcy, and did so through the Certificate of Incorporation liquidation provision in July 1997. Furthermore, neither Site/Tech nor any other party objected to Site Tech's representations that it had acquired Site/Tech's intellectual property, despite the fact that Site Tech sold SiteSweeper and other intellectual property to Starbase during the bankruptcy for $8.3 million. These assets represented $1 million of the $1.4 million of the value of Site Tech's assets initially set forth in the schedules. Thus, the sale of these assets represented a substantial amount of the consideration received by Starbase and resulted in 100% of the creditors' claims' being paid with interest. (Ex. 5, at 10 and 20.). Furthermore, several contracts related to the marketing and distribution of Site/Tech's SiteSweeper product were also sold to Starbase. (Ex. 13, at 1-2.)

Thus, the bankruptcy plan and the principal distributions in the bankruptcy relied heavily on the efficacy of the July 1997 asset transfer from Site/Tech to Site Tech. Because those transfers are settled and Site Tech's bankruptcy estate has been administered, it is too late now to challenge, based on supposed defects in documentation, whether in fact Site Tech acquired particular properties. 11 U.S.C. § 1127(b) (barring modifications of a plan after "substantial consummation").

In short, the bankruptcy order constitutes a final judgment that the liquidation provision operated to transfer Site/Tech's patent rights to Site Tech, and further consideration of the issue is barred by res judicata. On this basis alone, this Court should find as a matter of law that Site Tech owned the patents when it assigned them to Egger in September 1998, that SRA owns the patents today, and that SRA possesses standing to bring this suit.

### b. The terms of the liquidation provision demonstrate that it effectuated an automatic transfer of the patents to Site Tech.

Defendants claim that no transfer occurred pursuant to the liquidation provision in Site/Tech's certificate of incorporation, because the liquidation provision did not automatically transfer the patents, but instead merely set the stage for a transfer that never occurred. Defendants are wrong. By its very terms, the liquidation provision effectuated an automatic transfer of the patents, with no further action necessary, from Site/Tech to Site Tech. The provision directs, in mandatory language, the distribution of all of Site/Tech's assets: "[T]he entire remaining assets and funds of the corporation legally available for distribution, if any, *shall be distributed* ratably among the [preferred stock]holders . . . . Thereafter, any remaining assets and funds legally available for distribution hereunder *shall be distributed* solely to the holders of the Common Stock." (Ex. 14 (emphasis supplied).) And it spells out in precise terms exactly how the distribution is to be effectuated—first, a "ratable" distribution, and then, a distribution of all remaining assets "solely" to Site Tech, the sole remaining stockholder. It thus resembles the self-executing provisions in *Akazawa v. Link New Technology International Inc.*, 520 F.3d 1354 (Fed. Cir. 2008), and *Sky Technologies, LLC v. SAP AG*, No. 2:06-cv-440 (DF) (E.D. Tex. Aug. 25, 2008), which also spelled out precisely how they were to operate and left no discretion to any administrator. And it differs from the vague provisions that Defendants cite in *Pharm-Eco Laboratory, Inc. v. Immtech International, Inc.*, No. Civ. A. 18246, 2001 WL

220698 (Del. Ch. Feb.26, 2001.), which did not specify how the distribution was to occur and therefore was held not to call for an automatic distribution. (Ex. 11, at 7-8.) Furthermore, under 37 C.F.R. § 3.56, conditional assignments based upon the fulfillment of future condition are sufficient to transfer patents and are treated as absolute assignments by the PTO. Here, the liquidation provision mandates a transfer upon fulfillment of a condition: *"In the event of any liquidation . . . distributions to the shareholders of the corporation shall be made . . . ."* (Ex. 14 (emphasis supplied).) Thus, the presence of a condition subsequent further distinguishes the liquidation provision from the language in *Pharm-Eco Laboratory*, where the Court found that the clause was merely a statement of future intent to transfer the patent. Likewise, language describing the transfer of "all assets" is sufficient to transfer patents even though the patents are not specifically identified. (Ex. 15, at n.8.)

That the liquidation provision effectuated an automatic transfer is further corroborated by abundant sworn evidence that Defendants have not even attempted to controvert. Jeffrey Ait, the CEO of Site Tech and Site/Tech following the liquidation, and one of the core parties involved in the negotiation of the July 1997 acquisition, affirmed to the SEC no fewer than six times that Site Tech had acquired the patents through the liquidation—for example: "[The patented technology] was technology that [Site Tech] acquired in the [Site/Tech] Acquisition." (Ex. 15, at 10.) Ait likewise subsequently testified under oath that "In this transaction, [Site Tech] directly acquired . . . all of the then-existing assets of [Site/Tech], including its patents . . . ." (Ex. 2, ¶ 2.) In the ten years since Site Tech's acquisition of Site/Tech and since Ait first made this representation, not one Site/Tech employee, officer, or director, or any other person with first-hand knowledge of

the negotiations in July 1997 ever disputed this sworn testimony. To the contrary, Ait's sworn testimony stands unchallenged.[9]

Finally, Defendants argue that the transfer did not occur because no affirmative acts were taken, as supposedly required by Delaware General Corporation Law §§ 275-285 (wind up and dissolution provisions). These arguments fail because the transfers occurred by operation of a mandatory conveyance clause in Site/Tech's certificate of incorporation, not because of an actual statutory wind up under the DGCL.

3.  **Even if the patents belonged to Site/Tech in September 1998, as Defendants claim, Egger still would have acquired the patents at that time, because Site/Tech was bound by the Bill of Sale and Assignment.**

   a.  **Site/Tech was Site Tech's alter ego in September 1998.**

In its opening brief, SRA identified over twenty core commonalities between Site/Tech and Site Tech that demonstrated that the entities were alter egos in September 1998. (Ex. 15, at 13-14.) Defendants offer various responses, but all of them crumble under scrutiny.

• Defendants point out that Site/Tech's 1998 and 1999 tax returns reflect earnings of $18,920 in 1998 and $50,381 in 1999. (Ex. 11, at 16.) Site/Tech did not earn those sums through any independent business operations, however, but rather acquired them from Site Tech through a passive internal royalty structure that had been established during the July 1997 acquisition. (Ex. 16, at 17.) Indeed, the tax returns reflect no further revenues, demonstrating that Site/Tech had no independent operations in 1998 and 1999. Those tax returns also were not prepared by Site/Tech, but rather by Site Tech, because Site/Tech had no employees of its own. (Ex. 2, ¶ 2 ("[T]he former employees of Site/Tech became the employees of Site Tech . . . . Site

---

[9] In its opening brief, SRA also demonstrated that the patents transferred from Site/Tech to Site Tech pursuant to 35 U.S.C. § 261 and the ratification doctrine. (Ex. 15, at 11-13) Defendants' sole response was the response addressed here—that the liquidation provision did not operate to transfer the patents to Site Tech. Because, as already explained, Defendants are wrong, and the liquidation provision did in fact operate to transfer the patents to Site Tech, Defendants' § 261 and ratification arguments fail.

11

Tech maintained Site/Tech's tax records.") Further, the tax returns were prepared not in 1998 and 1999, but in 2001, because it was only in 2001 that anyone even realized that Site/Tech still existed. (Ex. 3, at 104-05.) Thus, the tax returns actually support a finding of alter ego.

• Defendants also claim that Site/Tech "retained offices and three employees in North Carolina after it became Site Tech's subsidiary . . . ." (Ex. 11, at 16.) This claim is false. As Ait testified, "I agreed to keep [the three employees] employed for one year in North Carolina but as employees of [Site Tech] not as employees of [Site/Tech]." (Ex. 3, at 107.) Furthermore, "Site Tech adopted and employed Site/Tech's . . . property as its own . . . ." (Ex. 2, ¶ 2.) Again, the evidence supports a finding that Site/Tech and Site Tech were alter egos.

• Defendants claim that Site/Tech "released a software product under its name." (Ex. 11, at 16.) This claim is irrelevant, because it concerns the relationship between Site Tech and Site/Tech in August 1997 (the date of the release), a mere month after Site Tech's acquisition of Site/Tech, whereas the operative date for determining alter ego is September 1998, over a year later. Defendants proffer no evidence that Site/Tech was engaged in any product development in September 1998. Defendants' claim is also disingenuous, because the press release on which Defendants rely contains numerous indications that Site Tech was already well on its way to converting Site/Tech into a shell. The headline of the press release states, "DeltaPoint and Site/technologies/inc. deliver SiteSweeper 2.0 . . . ." (Ex. 17.) The press release also quotes only DeltaPoint employees, evidencing the fact that all of Site/Tech's employees had already integrated into DeltaPoint. (Ex. 17.) The press release further states that "DeltaPoint plans to release SiteSweeper 2.0 on the company's Web site," negating Defendants' assertion that Site/Tech was engaged in business activity. (Ex. 17.) Finally, the press release nowhere discusses Site/Tech's business, but instead describes DeltaPoint's business in a section called "About DeltaPoint," and also nowhere provide Site/Tech's contact information, but instead

provides DeltaPoint's contact information, evidencing the fact that DeltaPoint absorbed Site/Tech's business operations. (Ex. 17.) Finally, Site Tech's sworn bankruptcy filings and SEC statements make clear that the released Site Sweeper 2.0 technology was actually a product of Site Tech, not Site/Tech. (Ex. 5, at 5.4 ("In July 1997, [Site Tech] acquired the technology to develop SiteSweeper 2.0 . . . ."); Ex. 26.)

- Defendants claim that "Ait set the record straight at his deposition, testifying that Site/Tech was *not* a shell entity after its acquisition by Site Tech." (Ex. 11, at 16 (emphasis in original).) This shamelessly mischaracterizes Ait's deposition testimony. Ait testified only that, to the extent that a "shell entity" owns no assets whatsoever, and to the extent that Site/Tech did own "desks, chairs, and computers" following its acquisition by Site Tech, Site/Tech was not a "shell entity" in September 1998. (Ex. 3, at 110.) Ait repeatedly insisted that, under a more reasonable definition of "shell entity," Site/Tech was a shell entity in September 1998: "Q. Wouldn't you agree, based on what we have seen here today, Mr. Ait, that [Site/Tech] was not a shell entity in 1998 or 1999? A. No, I don't agree with that. There was no business carried out by [Site/Tech]. . . . Q. . . . [Y]our opinion and belief, as you sit here today under oath, was that [Site/Tech] was a shell entity in 1998? A. Yes, [Site/Tech] was a wholly-owned subsidiary that did no business. I don't know what you classify as a shell but that's what I would classify as a shell." (Ex. 3, at 108.)

- Finally, Defendants note that Site Tech and Site/Tech did not "intentionally use[] their corporate structure to defraud Egger." (Ex. 11, at 17.) Delaware law does not require fraud to demonstrate alter ego, however, but instead requires only one of several types of injustices: "[C]orporate entities . . . may be disregarded . . . . in the interest of justice, when such matters as fraud, contravention of law or contract, public wrong, or where equitable consideration among members of the corporation require it, are involved." *Pauley Petrol. Inc. v. Continental Oil Co.,*

239 A.2d 629, 633 (Del. 1968). Here, the corporate distinction between Site Tech and Site/Tech should be disregarded in the interest of justice, to prevent contravention of contract, and in view of equitable considerations. Site/Tech had no independent ownership, directors, officers, employees, property, offices, business dealings, business departments, financial statements, headquarters, products, corporate records, bank accounts, director meetings, shareholder meetings, or operations in September 1998, when Egger bought the patents. (Ex. 2, ¶¶ 2-3.) Site/Tech was essentially an empty shell completely controlled by Site Tech. (Ex. 2, ¶ 2.) Site Tech represented—and to this day affirms through Ait—that it owned the patents-in-suit. (Ex. 2, ¶ 5.) Egger paid $100,000 out of his personal funds for the patents, and Site Tech accepted the money. (Ex. 2, ¶ 5.) Site Tech warranted that "it hereby transfers good and marketable title to the Purchased Assets." (Ex. 18.) Both Site Tech and Site/Tech intended the patents to be assigned to Egger, and Site/Tech authorized Site Tech to execute the assignment. (Ex. 2, ¶ 6.) Site Tech affirmed to the SEC that it had sold the patents to Egger. (Ex. 4.) On behalf of both Site Tech and Site/Tech Ait also ratified the assignment and disclaimed ownership of the patents in Egger's favor. (Ex. 2, ¶¶ 6-7.) Nobody with any interest in the patents has ever disputed the assignment. To strip Egger of his patent rights would be contrary to every party's intentions, contrary to contract, and contrary to every party's stated interests.

### b. Site Tech was Site/Tech's authorized agent for purposes of transferring the patents to Egger.

In its opening brief, SRA demonstrated that Jeffrey Ait, the CEO of Site Tech and Site/Tech in September 1998, signed the Bill of Sale and Assignment and assigned the patents to Egger on behalf of both entities. Defendants now argue that Ait was wearing only his "Deltapoint hat" when executing the assignment and therefore could not have bound Site/Tech. (Ex. 11, at 20.) Defendants misstate the facts. Ait's detailed testimony demonstrates that he

wore both his "Site Tech hat" and his "Site/Tech hat" while negotiating, executing, performing, and discussing the assignment to Egger. (Ex. 2, ¶ 6-7.) Through the Bill of Sale and Assignment, he granted Site Tech the authority to assign the patents to Egger on Site/Tech's behalf.[10] Through repeated representations on Site/Tech's behalf before, during, and after the assignment, he led Egger to believe that Site Tech possessed authority to assign the patents in its own name. And through the Bill of Sale and Assignment, through representations to Egger, through statements made to the SEC, and through sworn testimony given thereafter, he ratified, on Site/Tech's behalf, Site Tech's assignment of the patents to Egger.

### B. Even If Egger Did Not Acquire the Patents in September 1998, He Acquired Them as a Matter of Law in December 2000, When Defendants Claim Site Tech Acquired Title Thereto.

#### 1. Defendants' claim that title does not pass immediately and automatically to the assignee under the after-acquired title doctrine is wrong.

Defendants argue that after-acquired title does not transfer immediately and automatically to the assignee under the after-acquired title doctrine, and therefore, Daniel Egger could not have acquired the patents without bankruptcy court intervention. Defendants' assertion is contrary to hornbook law. After-acquired title conveys to the assignee *eo instante*—at the instant that the assignor acquires the title—and automatically, without any court intervention.[11]

---

[10] California Civil Code § 2309 deals with conferring actual authority where the party asserts that it was an explicit agent for the principal. This would not have application to SRA's apparent or ostensible authority theories of agency which pertain to situations where there is not an explicit agency agreement. Furthermore, even assuming that, as Defendants contend, the "equal dignities rule" called for Site/Tech to confer authority on Site Tech in writing, Site/Tech's conferral of authority on Site Tech comported with this rule.

[11] *See, e.g., Cherry v. Farmers Royalty Holding Co.*, 160 S.W.2d 908, 910 (Tex. 1942) ("The Court of Civil Appeals held that . . . the mineral interests . . . passed *eo instante* to the defendants. By such holding it applied the familiar rule known as the doctrine of after-acquired title . . . ." (citations omitted)); *Chevron U.S.A., Inc. v. State*, 993 So.2d 187, 2008 WL 4118905, at *14 n.4 (La. Sept. 8, 2008) ("[T]itle to property sold to another by a vendor who only later acquires title vests immediately upon sale in the vendee." (citations omitted)); *Frain v. Burgett*, 50 N.E. 873, 876 (Ind. 1898) ("The title acquired by the grantor who has conveyed by warranty inures *eo instanti* that he gains the title to his grantee, and vests in

## 2. Defendants' claim that the bankruptcy extinguished Egger's rights is wrong.

### a. The Bill of Sale and Assignment were not executory contracts and were not rejected in the Site Tech bankruptcy.

Defendants argue that the bankruptcy extinguished Egger's rights to the patents, because it rejected the Bill of Sale and the Assignment. Defendants are wrong. As a threshold matter, the Assignment was a separate agreement from the Bill of Sale, because it was a conveyance instrument with its own signature, and it was never rejected.[12] (Ex. 18.) While the Bill of Sale appears on the schedule of executory contracts, the Assignment does not. See Schedule G Executory Contracts and Leases. This stands to reason, since only the Bill of Sale contained an executory software license agreement with Site Tech as licensor. (Ex.18, § 7.) The debtor listed all of its licenses as executory contracts. (Ex. 19.) The Assignment is a conveyance instrument that was not executory and therefore was not scheduled as an executory contract and could not be rejected as an executory contract.

Under § 365 of the Bankruptcy Code, bankruptcy courts may only reject "executory"

---

him." (citations omitted)); Corpus Juris Secundum (Estoppel) § 25 (2008) ("As a general rule, estoppel has the effect of vesting after-acquired title in the grantee automatically and instantly, by operation of law, without further conveyance and without the intervention of any court." (citations omitted)).

Defendants misread *Mills*, wrongly attributing a quote as pertaining to the after-acquired title doctrine when it actually pertains to fraudulent transfer. *Mills Novelty Co. v. Monarch Tool & Manuf. Co.*, 49 F.2d 28 (6th Cir. 1931) ("[T]hrough fraud or mistake, a grant is made to A which should have been made to B . . . ."). In fact, immediately following Defendants' cited passage, *Mills* itself recognizes that title transfers immediately in the patent application context. *See id.* This idea of immediate transfer is what *Mills* reasoned "should be deemed to rest upon the principles by which a deed with warranty will convey in law [i.e., legal title] an after-acquired title." *See id.* Defendants also misread *Taylor Engines, Inc. v. All Steel Engines, Inc.*, 192 F.2d 171, 174 (9th Cir. 1951). Defendants rely on *dictum* stating that "[t]he equitable claim of the Nevada corporation could have been cut off by a sale to a bona fide purchaser." (Defs.' Reply, at 27.) This *dictum* is inapposite because a *bona fide* purchaser for value can "cut off" a claim by any earlier assignee, whether that assignee obtains full legal and equitable title, or only the latter. *See* 35 U.S.C. § 261. Moreover, California courts have adhered to the *eo instante* rule both before and after *Taylor*. *See Brush Elec. Co. v. Calif. Elec. Light Co.*, 52 F. 945, 963 (9th Cir. 1892) ("The sale of a patent right contains an implied warranty as to title, and an after-acquired title obtained by the vendor inures to the vendee."). In fact, the California legislature has codified the doctrine in the real property context. *See* CAL. CIV. CODE § 1106 (2008).

[12] The Bill of Sale was executed by Jeffrey Ait as Chief Executive Officer of Site Tech. The Assignment was separately executed by Sharon Fugitt as secretary of Site Tech.

obligations of the debtor, and federal law defines an "executory" obligation as one "on which performance is due to some extent on *both* sides." *Horton v. Rehbein*, 60 B.R. 436, 440-42 (9th Cir. 1986). Bankruptcy law holds that "executory contracts are those in which the obligations of *both* parties are so far unperformed that the failure of either to complete performance would constitute a material breach excusing the performance of the other." *Id.*

Furthermore, both the Bill of Sale and the Assignment contain language of complete and immediate assignment of full legal title to the Patents to Egger. Under bankruptcy law, an unperformed obligation to convey legal title is not an executory obligation. *See Horton*, 60 B.R. at 441 (9th Cir. 1986) ("The fact that a vendor retains legal title and must in the future convey it to the debtors does not render the contract executory any more than the duty of the holder of a promissory note to return the note when the debt is satisfied makes it executory" (internal quotation marks omitted)); *see Mitchel v. Streets*, 882 F.2d 233 (7th Cir. 1989) ("In our view, the delivery of a legal title is a mere formality and does not represent the kind of significant legal obligation that would render the contract executory."); *In re Kane*, 248 B.R. 216, 224 (1st Cir. 2000); *In re Belmonte*, 240 B.R. 843, 851 (Bankr. E.D. Pa 1999); *In re Walker*, 227 B.R. 870, 872 (Bankr. S.D. Ind. 1998). In *Horton*, the Ninth Circuit specifically considered whether a contract for deed's unperformed conveyance of legal title was an executory obligation:

> As a practical matter, the vendor performs no duties after the execution and deposit of title documents with the escrow agent. The vendor cannot terminate the agreement and recover possession of the property unless there is a material breach by the buyer. Unless a contract is executory on both sides, it cannot be an executory contract.

60 B.R. at 440. The Assignment is an absolute conveyance that forever relinquishes title to the Patents. As in *Horton*, once the deed was placed in escrow, no further action was required of Site Tech, and legal title would be transferred by operation of law and beyond the control of the

debtor.[13] Further, Egger took possession of the patents and continued to prosecute the applications, pay the legal bills, and improve the property by obtaining two new patents.[14] Under *Horton*, the Assignment was not an executory contract by reason of any unperformed duty to convey legal title, and was not and could not be rejected by Site Tech.

> **b. Even if the Bill of Sale and Assignment were rejected in the Site Tech bankruptcy, that still would not extinguish Egger's right to the legal title to the patents.**

Even if the Bill of Sale and Assignment were rejected in the Site Tech bankruptcy, that still would not bar operation of the after-acquired title doctrine. This is because—it is undisputed—Egger acquired at least equitable title to the patents through the Bill of Sale and Assignment. *See Morrow v. Microsoft Corp.*, 2004 WL 1781010, *4 (N.D. Cal. 2004) ("Even if the patentee's transfer of rights does not vest legal title in the successor, it may constitute a transfer of equitable title."). The subsequent rejection of contracts in 2000 does not change the fact that Egger had already received equitable title in 1998.

Equitable title is not merely an equitable claim; it is a vested property right in the grantee. *See Ligon v. City of Detroit*, 739 N.W.2d 900, 906 (Mich. App. 2007) ("[T]his equitable interest . . . was a preexisting vested property right"); *In re Marriage of Perkins*, 2004 WL 112598, at *2 (Tex. App.—Amarillo Jan. 23, 2004) ("[E]quitable title is a property right."). It is transferred at the moment that a conveyance with warranty of title is executed. *See Cook v. U.S.*, 37 Fed. Cl. 435, 440 (Fed. Cl. 1997) ("[T]he date of acceptance of the purchase price . . . is the legal date of vesting of equitable title, a protected property right."); *Burk Royalty Co. v. Robbins Title Ptr*, 117

---

[13] In situations where legal title had not yet been conveyed, delivery of legal title has been described as a "mere formality," and not "the kind of significant legal obligation that would render the contract executory." *See Mitchell v. Streets*, 882 F.2d 233, 235 (7th Cir. 1989). While some cases in other jurisdictions hold that conveyance of title can be executory, in those cases, no conveyance instrument had been executed as of the date of filing, which is a substantial act of performance required of the seller. It is undisputed that the assignments occurred here long before filing, and were listed on the bankruptcy schedules available to all interested parties.

[14] *Horton*, 60 B.R. at 441 and n. 5 (noting possession and improvement to the property as a relevant fact).

F.3d 1417 (5th Cir. 1997). It may be transferred to third parties. *See Faulks v. Kamp*, 3 F. 898, 901-02 (S.D.N.Y. 1880). And with it comes the right to receive legal title once the grantor acquires legal title. *See id.* The Federal Circuit has repeatedly recognized the doctrine of equitable title with respect to patents.[15]

Under bankruptcy law, an assignee who possesses equitable title to property is entitled to possess the legal title to that property whenever the assignor obtains it, even if the underlying assignment contract is rejected. Defendants cite no authority for the proposition that a § 365 rejection unwinds an absolute conveyance. To the contrary, a contract is rejected to limit a debtor's burden for future performance, but does not rescind that which has already occurred. As one court explained:

> Even if the Agreement was executory, Debtor misinterprets the effects of rejection. Debtor believes rejection will restore its ownership rights to the servicing rights, and consequently the ability to resell the rights. . . . A fully executed contract cannot be rescinded. Debtor is attempting, through rejection, to regain what it has already sold, but without restoring the parties to the status quo ante. Instead of returning the purchase price, Debtor proposes leaving MVB holding a general unsecured claim for $4 million. Contrary to Debtor's argument, rejection of an executory contract constitutes a breach of such contract . . . . Moreover, rejection does not affect executed portions of an executory contract.

*In re DMR Fin. Servs., Inc.*, 274 B.R. 465, 472 (E.D. Mich. 2002) (internal citations and modifications omitted); *see Rudaw/Empirical Software Prods. Ltd. v. Elgar Elecs. Corp.*, 83 B.R. 241, 246 (Bankr. S.D.N.Y. 1988) ("[R]ejection of an executory contract is not the equivalent of rescission. . . . [R]ejection does not give the debtor the right to recover property

---

[15] The Federal Circuit recognizes that equitable title to a patent can be conveyed in various circumstances, commonly including: (1) when a patent is subject to an agreement to assign (*see, e.g., Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574, 1576 (Fed. Cir. 1991)); or (2) where a warranty deed purports to convey full title, but full title is lacking in the grantor (*see, e.g., Kahn v. Gen. Motors Corp.*, 77 F.3d 457, 458-59 (Fed. Cir. 1996)). The Federal Circuit has acknowledged the following definition of equitable title with respect to patents: "Equitable title may be defined as "the beneficial interest of one person whom equity regards as the real owner, although the legal title is vested in another." BLACK'S LAW DICTIONARY 1486 (6th ed. 1990); *see Arachnid*, 939 F.2d at 1578 n.3.

sold and transferred to the other party. . . . Such property does not revert to the debtor as a result

of the debtor's rejection of an executory contract.").

Likewise, under bankruptcy law, equitable property interests held by assignees do not

become part of the bankruptcy estate and therefore cannot be extinguished in the bankruptcy:

> Property in which the debtor holds, as of the commencement of the case, only
> legal title and not an equitable interest . . . sold by the debtor but as to which the
> debtor retains legal title . . . becomes property of the estate . . . only to the extent
> of the debtor's legal title to such property, but not to the extent of any equitable
> interest in such property that the debtor does not hold.

11 U.S.C. § 541(d); *see Curtis Mfg. Co., Inc. v. Plasti-Clip Corp.*, 933 F. Supp. 94 (D.N.H.

1995) ("Curtis, as the owner of a misappropriated patent, would have taken only its legal title to

the patent through the bankruptcy proceedings, and thus plaintiffs' equitable interest was neither

encumbered, diminished, nor discharged upon confirmation of the plan.").[16] Thus, when faced

with the issue of whether a bankruptcy debtor that acquired title could hold legal title

notwithstanding a previous conveyance, the Southern District of Texas held:

> Corpus also argues that when the bankruptcy court dismissed the bankruptcy, title
> to the property re-vested in the Arriagas and became subject to execution by him.
> Again, he misunderstands the law. Title subsequently acquired by a person who
> had previously conveyed that property with warranty instantly passes to the
> purchaser. .... Even if the Arriagas did not convey good title at the sale, following
> the bankruptcy, Compean's title was perfected.

*U.S. v. Compean*, 2006 WL 1737536, at *3 (S.D. Tex. June 23, 2006) (citations omitted). [17]

---

[16] *See also U.S. v. Whiting Pools, Inc.*, 462 U.S. 198, 204 (1983); *Cent. Trust Co. v. Shepard*, 29 B.R.
928, 932 (Bankr. M.D. Fla. 1983) ("Under the Bankruptcy Code, where a debtor holds only bare legal
title to property without any equitable interest, bare legal title is all that becomes property of the estate.");
*Univ. Bonding Ins. Co. v. Gittens and Sprinkle Enters., Inc.*, 960 F.2d 366, 371 (3rd Cir. 1992)
("[Bankruptcy law] simply does not authorize a trustee to distribute other people's property among a
bankrupt's creditors."); *Matter of Quality Holstein Leasing*, 752 F.2d 1009 (5th Cir.1985); *Matter of TTS,
Inc.*, 158 B.R. 583, 584 (D. Del. 1993) (holding that when debtor holds only legal title to property with
beneficial interest being held by another party, that property is included in debtor's estate only to extent of
debtor's legal title to property, not to extent of any interest in property that debtor does not hold.); *In re
Encinas*, 27 B.R. 79, 80-81 (Bankr. D. Or. 1983) (same).

[17] The Supreme Court's holding in *Bush v. Person*, 59 U.S. 82 (1855), is consistent with this ruling. In
*Bush*, the Supreme Court held that under the Bankruptcy Act, the debtor's personal discharge did not

Indeed, in this instance, even Site Tech's legal title to the patents-in-suit never became—

and never could have become—part of the bankruptcy estate.[18] By Defendants' own argument,

Site Tech did not receive legal title to the patents until December 2000, after the confirmation of

the plan in July 2000. (Ex. 20, at 5.) Property acquired post-confirmation is not property of the

estate.[19] Indeed, the bankruptcy estate ceases to exist upon confirmation of a plan and vests in

the debtor.[20] Furthermore, the automatic stay does not protect post-confirmation assets not

subject to the plan.[21] Thus, even under Defendants' theory, neither legal nor equitable title to the

patents became part of the bankruptcy estate, or subject to the automatic stay.[22]

Thus, Egger's equitable title to the patents—and his right to the legal title to the patents

once Site Tech obtained it—would not have been extinguished in the bankruptcy even if Site

Tech had rejected the Bill of Sale and Assignment. Moreover, Site Tech's legal title to the

patents—which, according to Defendants, it acquired only in December 2000—never became a

---

affect application of the doctrine of after-acquired title. *See id.* at 83-84. Even more compelling, in this matter, the bankruptcy schedules acknowledged and ratified the prior transfer to Egger, and did not discharge it in any sense. Nor was there even a discharge of any kind granted to the debtor. In *Old Republic Insurance Co. v. Currie,* 665 A.2d 1153, 1155 (N.J. Super. Ch. 1995), likewise, the court noted that "even if the mortgagor's personal liability for the debt which is secured by the mortgage has been extinguished by bankruptcy, the warranty obligation [under the after acquired property doctrine] is not nullified and he must produce the property."

[18] It should be further noted that since legal title of the Patents was not in the bankruptcy estate, the debtor's strong arm powers as a lien creditor would be inapplicable to Egger's property interest.

[19] *See* 11 U.S.C. § 541(a) (property of the estate is "all legal and equitable interests of the debtor in property as of the *commencement* of the case"); *Am. Bankers Ins. Co. of Fla. v. Maness,* 101 F.3d 358, 362 (4th Cir. 1996) ("Generally, property not owned at the time of the petition but only subsequently acquired by the debtor does not become property of the bankruptcy estate"); *Palmer v. Vogel,* 57 B.R. 332 (Bankr W.D. Va. 1986).

[20] 11 U.S.C. § 1142; *Haw v. Graue,* 158 B.R. 965, 970(S.D. Tex. 1993)("Plan confirmation dissolves the bankruptcy estate"); *Greenley Energy Holdings of Penn. v. Stone,* 110 B.R. 173, 180 (Bankr. E.D. Penn 1990); Plan, par. 14.2.

[21] *See U.S. Dep't of Air Force v. Carolina Parachute Corp.,* 907 F.2d 1469, 1474 (4th Cir. 1990) ("[T]here can be no further application of the automatic stay after confirmation" ); *In re Allen,* 300 F.3d 1055, 1059 (9th Cir.2002); *In re Barker-Fowler Electric Co.,* 141 B.R. 929, 938 (Bankr. W.D. Mich. 1992); *In re Hakim,* 244 B.R. 820, 822 (Bankr.N.D.Cal.1999)( "In the Chapter 11 context, whether the automatic stay terminates upon operation of law depends on whether or not a plan has been confirmed").

[22] *Accord Barker-Fowler,* 141 B.R. at 938 (after confirmation of the plan the automatic stay lifts); *Calderon v. Commodore Holdings Ltd.,* 2004 WL 385062, at *1 (S.D.N.Y. Mar. 1, 2004) (same).

part of the bankruptcy estate and therefore vested immediately and automatically in Egger pursuant to the after-acquired title doctrine.

### 3. Defendants' claim that Egger's supposedly unclean hands bar application of the after-acquired title doctrine mischaracterizes Egger's actions, ignores fundamental requirements of the unclean hands doctrine, and flies in the face of equity.

Defendants argue that application of the after-acquired title doctrine in this case is barred by the doctrine of unclean hands because Egger supposedly filed a fraudulent assignment ("the 2005 Assignment") with the PTO. (Ex. 11, at 28.) Defendants mischaracterize what occurred in February 2005 and ignore fundamental principles of the unclean hands doctrine.

In February 2005, Egger's attorney, Chris Lynch, discovered that Egger's September 1998 Bill of Sale and Assignment had never been recorded with the PTO, and he instructed Egger that he had to provide notice of that transaction to the PTO immediately. (Ex. 1, at 96; Ex. 21, ¶ 4.) Egger could not immediately locate the Bill of Sale and Assignment, so Lynch prepared the 2005 Assignment for Egger's signature. (Ex. 1, at 82; Ex. 21, ¶ 4.) At the time of signing, Lynch told Egger that he was authorized as the former President of Site/Tech to execute the document as a placeholder for the Bill of Sale and Assignment. (Ex. 1, at 110.; Ex. 21, ¶ 5.) Further, Egger did not realize that there was a difference between "Site Tech"—the assignor named in the Bill of Sale and Assignment—and "Site/Tech"—the assignor named in the 2005 Assignment. (Ex. 1, at 90.) The central message that Egger and Lynch intended to communicate through the 2005 Assignment—that Egger had purchased the patents from Site Tech—was true. Therefore, Egger signed it without revision. (Ex. 21, ¶ 4.) Egger's deposition testimony shows that Egger's intention was not, as Defendants claim, to defraud Site/Tech by assigning to himself patents that Site/Tech owned. Egger's testimony demonstrates that his intention was merely to provide notice, in the manner advised to him by his attorney, of patents that he had already

acquired from Site Tech: "My understanding was that nothing was actually transferred or assigned by this document, this was purely for notice. . . . I was told by my attorney, Chris Lynch, that this was the correct form to provide this notice, and he gave it to me this way and I relied on his advice and I signed it and we filed it." (Ex. 1, at 80-82.) Chris Lynch has also attested to Egger's intentions: "The purpose of the 2005 assignment was . . . to bring the PTO ownership records current with what we believed to be the actual state of ownership, that is, ownership by Daniel Egger." (Ex. 22, at 117.)

The truth of Egger's testimony is further confirmed by the testimony of Jeffrey Ait, the former CEO of Site/Tech, the very person whom Defendants claim Egger defrauded: "The 2005 assignment was within the intent of all the parties to the transaction and fairly represented the transaction." (Ex. 2, ¶ 8.) Ait further ratified the 2005 assignment by both Site Tech entities. (Ex. 2, ¶ 7.) Consistent with Egger's stated intention of merely providing notice of rights he owned since 1998, Egger also subsequently located and filed—so as to make the PTO records perfectly clear and complete—the Bill of Sale and Assignment that actually transferred the patent rights to him. (Ex. 24.) Attached to this brief is a contemporaneous email corroborating that Egger had initially misplaced the Bill of Sale and Assignment, but later located and filed those documents. This disproves Defendants' theory that the 2005 Assignment was created to correct the name of the party in the Bill of Sale and Assignment. (Ex. 23.)

In short, Egger did not deceive anyone in an attempt to fraudulently acquire the patents-in-suit. Egger's supposed unclean hands did not harm Site/Tech, the supposedly defrauded party. No other party was harmed either. Defendants were not harmed. Egger later transferred the patents to SRA, the present owner, and it is undisputed that SRA is without blame. Therefore, as a threshold matter, the equities hardly favor the remedy that Defendants seek— stripping SRA of the patents-in-suit. To the contrary, that remedy would be draconian.

Defendants' also ignore fundamental principles associated with the unclean hands doctrine. First, Defendants must show willful misconduct by the party requesting relief from the Court. *In re Aimster Copyright Litig.*, 252 F. Supp. 2d 634, 655 (N.D. Ill. 2002) (Conduct of non-party is irrelevant to the doctrine of unclean hands which "prevents plaintiffs from obtaining relief for conduct in which they themselves participated."); *Sec. Pacific Mortg. and Real Estate Servs., Inc. v. Canadian Land Co.*, 690 F. Supp. 1214, 1224 (S.D.N.Y. 1988). It is undisputed that SRA, the plaintiff in this case, has engaged in no misconduct whatsoever. Further, Egger has never controlled or owned SRA, which was formed in 2006—well *after* the 2005 Assignment—following the purchase of the patents by a third party. Rather, SRA and its parent company paid over a million dollars to acquire the patents from Egger and Software Rights Archive, Inc. Applying unclean hands here therefore would strip the patents from SRA, an innocent purchaser who paid value, and allow a party that misstated its ownership of a patent to benefit from its misstatement and keep both the patents and the money. This outcome is inconsistent with any principle of equity.

Second, the doctrine applies only where a party seeks equitable relief from a court: "The unclean hands doctrine is used to defeat an undeserving plaintiff's claim *for equitable relief* against a defendant that he has injured. *Positive Black Talk Inc. v. Cash Money Records, Inc.*, 394 F.3d 357, 379 (5th Cir. 2004) (emphasis supplied). Since the after-acquired title doctrine works automatically, by operation of law, without intervention of the Court, SRA is not seeking any equitable relief from this Court.

Third, "[t]he alleged wrongdoing of the plaintiff does not bar relief unless the defendant can show that he has personally been injured by the plaintiff's conduct." *Mitchell Bros. Film Group v. Cinema Adult Theater*, 604 F.2d 852, 863 (5th Cir. 1979); *see Bank of Saipan v. CNG Fin. Corp.*, 380 F.3d 836, 842 (5th Cir. 2004) ("[T]he unclean hands defense is inapplicable

altogether where the plaintiff's sins do not affect or prejudice the defendant.") (applying Texas law); *Alcatel USA, Inc. v. DGI Techs., Inc.*, 166 F.3d 772, 796-97 (5th Cir. 1999) ("[W]here the harm done to the defendant is not serious and can be otherwise corrected, the unclean hands maxim should not be applied." (internal quotation marks omitted)) (applying Texas law). Here, it is undisputed that Defendants have not been injured by the 2005 Assignment.

Fourth, "courts of equity . . . do not close their doors because of plaintiff's misconduct, whatever its character, that has no relation to anything involved in the suit . . . ." *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S 240, 245 (1933). Here, the 2005 Assignment has no bearing whatsoever on infringement, validity, or any other issue in this case. Most importantly, it has nothing to do with standing. It occurred seven years *after* the Bill of Sale and Assignment on which SRA relies for title and through which Egger acquired the patents. (Ex. 18 and Ex. 25.) He did not acquire them via the 2005 Assignment, nor has Egger or SRA ever taken the position in this Court or in any other proceeding that he received title through the 2005 Assignment. Rather, because the 2005 Assignment was merely intended to provide *notice* of patents rights that Egger already had, it really is extraneous to Egger's acquisition and disposition of the patents. Indeed, as a mere notice document, the 2005 Assignment is a document with no legal effect; it is settled law that merely filing a notice of patent ownership at the PTO does not operate to establish or transfer any patent rights. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004) ("[R]ecordation is a ministerial act and reflects no determination as to the legal validity of the document filed or its effect, if any, on title to the patent or patent application."). Thus, Defendants' unclean hands argument must be denied.

## III.   CONCLUSION

Defendants' motion to dismiss should be denied, and this Court should hold as a matter of law that SRA owns the patents-in-suit and has standing to bring this case.

Respectfully submitted,

*Lee Kaplan (by permission /RD)*

Lee L. Kaplan
LEAD ATTORNEY
State Bar No. 11094400
SMYSER KAPLAN & VESELKA, L.L.P.
700 Louisiana, Suite 2300
Houston, Texas 77002
(713) 221-2323
(713) 221-2320 (fax)
lkaplan@skv.com

Victor G. Hardy
State Bar No. 00790821
(Requesting Admission *Pro Hac Vice*)
Andrew G. DiNovo
State Bar No. 00790594
Adam G. Price
State Bar No. 24027750
Jay D. Ellwanger
State Bar No. 24036522
DINOVO PRICE ELLWANGER LLP
P.O. Box 201690
Austin, Texas 78720
(512) 681-4060
(512) 628-3410 (fax)
vhardy@dpelaw.com

*Of counsel:*

S. Calvin Capshaw
State Bar No. 03783900
Elizabeth L. DeRieux
State Bar No. 05770585
CAPSHAW DERIEUX
1127 Judson Road, Suite 220
P.O. Box 3999
Longview, TX 75606-3999
(903) 236-9800
(903) 236-8787 (fax)
ccapshaw@capshawlaw.comRobert M. Parker

State Bar No. 15498000
Robert C. Bunt
State Bar No. 00787165
Charles Ainsworth
State Bar No. 0078352
**PARKER, BUNT & AINSWORTH, P.C.**
100 East Ferguson, Suite 1114
Tyler, Texas 75702
(903) 531-3535
(903) 533-9687 (fax)

### *CERTIFICATE OF SERVICE*

The undersigned hereby certifies that all counsel of record who are deemed to have consented to electronic service are being served with a copy of this document via the Court's CM/ECF system per Local Rule CV-5(a)(3) on December 15, 2008.

Lee Kaplan (by permission /RD)

Lee L. Kaplan